**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,
4805 Mt. Hope Drive
Baltimore, MD 20215,

REVEREND ANDRE MILLER, NICHOLAS LITTLE, and DANIELLA PIERRE,

*Plaintiffs*,

vs.

TODD BLANCHE, in his official capacity as Attorney General of the U.S. Department of Justice,

HARMEET DHILLON, in her official capacity as Assistant Attorney General of the Civil Rights Division of the U.S. Department of Justice,

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Ave. NW
Washington, D.C. 20530

*Defendants*.

**Civil Action No. ___________**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1. Defendants are spearheading a Department of Justice ("DOJ") Poll Monitoring Program for the November 2026 election that will be unlike any of the limited election monitoring efforts that have been undertaken by DOJ in the past. Defendants are tossing aside the substance of the prior monitoring program, while maintaining its façade. Defendants describe their plan to deploy "election monitors" in the upcoming election as an important part of their broader effort to pursue and prosecute people based on purported allegations of widespread voter fraud—and to

scrutinize the activities of election workers who, according to Defendants, allow it to occur. There is no federal statute that gives Defendants the authority to turn polling places into interrogation rooms.

2. Even worse, Defendants and their agents have issued a series of unprecedented public statements about DOJ's rapidly expanding monitoring plans this cycle—which includes prosecutors and other law enforcement personnel. This marks a significant departure from monitoring efforts in years past, which have been limited in scope and carefully tailored. Instead of merely monitoring whether states are complying with federal voting rights laws, Defendants have made clear that promoting "election integrity" and investigating debunked allegations of voter fraud will be a central focus of DOJ's "election monitoring" plan:

- On August 17, 2026, Defendant Assistant Attorney General Harmeet Dhillon announced plans to send 1,000 Department of Justice employees to "monitor" polling sites across the country during the upcoming November 3, 2026 general election ("Poll Monitoring Program"), although DOJ has never deployed more than 600 monitors in a prior election.[1] On September 22, 2026, Defendant Dhillon publicly stated that she is "pretty close" to reaching 1,000 volunteers, and that "[t]his is going to be the biggest DOJ election observer effort in history."[2] The scope and magnitude of Defendants' "election monitoring" plan appears to continue to expand.

- On October 4, 2026, Defendant Attorney General Todd Blanche stated that there will be "a thousand or more" of the "election monitors." Defendant Blanche also stated that they will be dispatched to "every state" in the country on Election Day.[3]

- Defendant Dhillon stated on August 20, 2026 that monitors would be deployed to locations "where there may be voter fraud issues that we've seen."[4] And on July 7, 2026, while

[1] Lynch, Sarah. *Justice Department to Send a Record 1,000 Monitors to Polling Places in Midterm Elections*. CBS News, Aug. 18, 2026. https://www.cbsnews.com/news/justice-department-election-monitors-midterms/.

[2] Knutson, Jacob. *DOJ Close to Recruiting 1,000 Election Monitors for Midterms, Harmeet Dhillon Says*. Democracy Docket, Sept. 22, 2026. https://www.democracydocket.com/news-alerts/doj-close-to-recruiting-1000-election-monitors-for-midterms-harmeet-dhillon-says/.

[3] "*AG Todd Blanche Hits Back on Deportation Policy, Election monitor Fears,"* Fox News, Oct. 4, 2026. Video available at: https://www.foxnews.com/video/6406211288112.

[4] Bloomberg Talks: Harmeet Dhillon (Aug. 17, 2026), https://www.bloomberg.com/news/audio/2026-08-17/bloomberg-talks-harmeet-dhillon-podcast; RCPod, Harmeet Dhillon Joins to Talk Election Integrity (Aug. 20,

publicly discussing her plans for November, Defendant Dhillon suggested that Justice Department "election monitors" would ensure that no citizen's vote would be "canceled out" by someone who "should not be voting"—even though no federal statute gives Defendants or any "election monitors" deployed under their direction such authority.[5]

- In an October 2026 statement, a Justice Department spokesperson said all "department attorneys, including prosecutors, will serve as election monitors."[6] The spokesperson claimed that this has happened "in many past elections," but that statement is not true.[7]

- On September 15, 2026, Director of the Federal Bureau of Investigation Kash Patel provided testimony before the Senate Judiciary Committee.[8] Director Patel stated that the FBI, a subsidiary agency of the Justice Department, will likely participate in the general election. According to Director Patel, "[i]f there's a reason to go there" on the basis of "a violation," then "we will." Indeed, at least one FBI agent served as a DOJ election monitor at Maricopa County polling places during Arizona's primary election even though federal law expressly prohibits armed federal agents from accessing polling sites. 18 U.S.C. § 592.

3. Defendants' expansive Poll Monitoring Program and the statements they are making about the program are intimidating voters, including Plaintiffs, Black voters and other voters of color. The Poll Monitoring Program's implementation further threatens to disrupt the conduct of the November 3, 2026, general election. Plaintiffs perceive these statements to mean that DOJ will monitor, surveil, investigate, and target voters, poll workers, and election officials for potential criminal prosecution during the voting process. Plaintiffs Little, Pierre, Miller, and

---

2026), https://music.youtube.com/watch?v=nl9ThUQpnPc&si=dp-CUllEItboIgNq&t=1080; https://www.foxnews.com/video/6406211288112.

[5] Video posted by Harmeet Dhillon (@AAGDhillon), X, We @TheJusticeDept are proud to safeguard every American's right to vote — and we will continue routine, nonpartisan election monitoring that's been standard under both Republican & Democrat administrations for decades. Stay tuned for more! (July 7, 2026), https://x.com/AAGDhillon/status/2074616926941114411.

[6] Jacob Knutson, *DOJ dispatched criminal prosecutors, FBI agent to monitor Arizona's primary, documents reveal*, Democracy Docket (Oct. 6, 2026), https://www.democracydocket.com/news-alerts/doj-dispatched-criminal-prosecutors-fbi-agent-to-monitor-arizonas-primary-documents-reveal/.

[7] On October 2, 2026, Plaintiff NAACP and co-counsel Advancement Project sent a letter to Eric Neff, the Acting Chief of the Voting Rights Section at the Civil Rights Division, and Harmeet Dhillon, the Assistant Attorney General of the Civil Rights Division, requesting a clear answer on whether the Department of Justice will use criminal prosecutors and other criminal law enforcement agency personnel from the DOJ as part of the "election monitors." Exhibit A. Letter to Eric Neff and Harmeet Dhillon. At the time of this filing, no response has been received.

[8] Ashley Murray, *Patel won't say whether FBI agents will be at the polls this fall*, Government Executive (Sept. 15, 2026), https://www.govexec.com/management/2026/09/patel-wont-say-whether-fbi-agents-will-be-polls-fall/416002/.

many other members of Plaintiff NAACP find the presence of federal prosecutors, agents, marshals, and other federal law enforcement to be inherently intimidating. Plaintiffs are not comfortable voting if they are being watched by DOJ election monitors at a polling place under the present circumstances.

4. Defendants' announcements of their plans to deploy criminal prosecutors, agents and other unauthorized individuals inside polling places to watch voters check in and cast ballots causes intimidation and fear, and deters voters from freely exercising their right to the franchise in violation of Section 11(b) of the Voting Rights Act. The Supreme Court has recognized that many states have statutes in place under which "law enforcement officers generally are barred from the vicinity of the polls to avoid any appearance of coercion in the electoral process." *Burson v. Freeman*, 504 U.S. 191, 207 (1992). Congress, recognizing that risk, specifically passed Section 11(b) to ban acts that "threaten, intimidate, or coerce" voters or election officials. 52 U.S.C. § 10307(b).

5. Plaintiffs' concerns are well-founded and, unfortunately, have already manifested. Defendants' deployment of DOJ criminal prosecutors and an FBI special agent to the polls during Arizona's 2026 primary election, and their promise to deploy criminal prosecutors as election monitors again during the November general election, has increased Plaintiffs' alarm and fear. Such practices are contrary to prior practice, conflict with longstanding Justice Department policy, and violate federal law. In the past, the Justice Department appropriately barred criminal prosecutors, FBI agents and staff, and U.S. Marshalls and their staff, from serving as monitors. This prohibition aligns with federal laws that prohibit voter intimidation and helped to ensure that the Justice Department's monitoring efforts were tailored and limited in scope to prevent any risk of intimidation or interference with voters' exercise of the franchise.

6. The limited deployment of neutral, well-trained federal election monitors to observe compliance with federal civil rights laws is not intimidating where there is a basis for their presence. Indeed, DOJ's deployment of "election monitors" has historically been limited in scope and carefully proscribed to ensure that there was no interference with the conduct of the election, no intimidation of voters. A limited, hands-off election monitoring effort is not what the Justice Department is planning this year.

7. In recent public statements, the Justice Department has conflated its 2026 Poll Monitoring Program with the Department's federal observer program. They are distinct efforts. Federal observers are authorized by statute; the deployment of election monitors is not.

8. DOJ, through its Civil Rights Division, has deployed DOJ civil attorneys and professional staff to monitor and assess voting in a limited number of jurisdictions around the country. In the past, these individuals were carefully trained and deployed for the limited purpose of viewing activity at polling sites to assess compliance with federal civil rights laws. Because no federal statute grants DOJ the authority to engage in this monitoring, and because the Constitution reserves the power to administer elections to the States, DOJ's discretionary deployments were historically limited in scope. They only occurred if and when (1) there were complaints, deemed colorable by DOJ career civil servants, that invoked specific federal voting rights statutes enforced by the Civil Rights Division; (2) jurisdictions received advance notice of the plan to send such monitors; (3) the jurisdiction did not object; (4) the public received advance notice of the plan to send monitors; and (5) the Justice Department trained qualified personnel to ensure respect for any and all local and state laws and restrictions.

9. Under prior administrations, the deployment of "election monitors," where permitted by jurisdictions, focused on ensuring, among other things, that (1) no voter is subject to

voter intimidation under Section 11(b) of the Voting Rights Act, that (2) voters with disabilities had access to polling sites pursuant to the Americans with Disabilities Act, that (3) voters entitled to statutorily-required language assistance were provided such support pursuant to Section 203 of the Voting Rights Act, and that (4) certain voters who face challenges with voting are able to receive help from their assistor of choice pursuant to Section 208 of the Voting Rights Act.

10. Defendants' use of the Poll Monitoring Program to pursue voter fraud allegations bears no resemblance to this past practice. Defendants' Poll Monitoring Program does, however, closely align with Defendants' broader efforts to use the federal government's prosecutorial authority to substantiate the Administration's baseless claims of widespread voter fraud. On July 7, 2026, the same day Defendant Dhillon announced the DOJ's election monitoring efforts for the 2026 primaries, for example, the Department sent letters threatening election officials in all 50 states and the District of Columbia with federal criminal charges tied to specious allegations of noncitizen voting.[9] And, according to public reporting, Associate Deputy Attorney General Aakash Singh warned DOJ supervisors that prosecutors could be fired if they decline to pursue cases of reported election fraud, and that political appointees—not line prosecutors—would make the final decision on whether a criminal case goes forward.[10]

11. State and local officials have expressed grave concern regarding the Justice Department's 2026 "election monitor" deployment. Governor Mark Gordon, a Wyoming Republican, described the Justice Department election monitors deployed to his state for their 2026 primary election as "aggressive" and "irregular." Governor Gordon also indicated that the conduct

---

[9] Michael Kosnar & Kyla Guilfoil, *DOJ threatens criminal charges for state election officials over noncitizen voting*, NBC News (July 8, 2026), https://www.nbcnews.com/politics/elections/doj-warns-criminal-charges-state-election-officials-non-citizen-voting-rcna353433.

[10] Carol Leonnig and Ken Dilanian, *Top DOJ official warned that prosecutors would be fired for not pursuing alleged voter fraud, according to sources*, MS NOW (Sept. 18, 2026), https://www.ms.now/news/top-doj-official-warned-prosecutors-would-be-fired-for-not-pursuing-alleged-voter-fraud-according-to-sources.

of the "election monitors" appeared to exceed the laws set by Congress.[11] Wyoming officials have also confirmed that the Justice Department failed to provide advance notice that they were coming to monitor elections in Wyoming, undermining the central role state and local officials play in running their elections.

12. Defendants' statements indicate that they will deploy DOJ "election monitors" in a way that, for the first time, pursues baseless claims of voter fraud with no connection to the federal civil rights statutes that are supposed to undergird the work of the Civil Rights Division. They indicate that Defendants will abuse the deployment of election monitors to assess issues beyond federal civil rights laws, which risks interfering with election officials' efforts to conduct the election safely and securely.

13. Defendants' statements create the specter of federal criminal prosecutors and other law enforcement monitoring and confronting voters at polling places, which is instilling fear in and having a chilling effect on Plaintiff Little, Pierre, Miller, other NAACP members, and the public at large. The 2026 "election monitoring" plan constitutes a form of voter intimidation that violates Plaintiffs' rights under Section 11(b) of the Voting Rights Act. Defendants' deployment of prosecutors and other law enforcement personnel as Justice Department election "monitors" in the 2026 election further violates the Administrative Procedure Act. Defendants should not be permitted to cast the pall of federal prosecution over the voting process.

## PARTIES

14. The National Association for the Advancement of Colored People (NAACP) is the oldest and largest civil rights organization in the country. A nonprofit and nonpartisan organization,

[11] Adam Edelman, *Wyoming's Republican governor raises concerns over aggressive DOJ election monitors*, NBC News (Aug. 27, 2026), https://www.nbcnews.com/politics/2026-election/wyoming-republican-governor-concerns-aggressive-doj-election-monitors-rcna594730.

its mission is to achieve equity, political rights, and social inclusion by advancing policies and practices that expand human and civil rights, eliminate discrimination, and accelerate the well-being, education, and economic security of Black people and all persons of color. The NAACP has been at the forefront of fighting against racial discrimination in voting and fighting for the rights of its members and those of all lawfully registered U.S. citizens to cast ballots and have those ballots counted.

15. The NAACP has approximately 200,000 members across every state in the nation and Washington, D.C., many of whom are registered voters. Consistent with its mission, the NAACP operates longstanding voter-registration, voter-assistance, mail-voting, and election protection programs.

16. Its network of state conferences, local branches, college chapters, prison chapters, and youth councils conducts voter-registration drives, canvassing, voter contact, and election protection work. The NAACP recruited more than 100,000 volunteers for that work before the 2024 election and launched a $20 million GOTV campaign to mobilize 6.5 million Black voters across fourteen states in 2026. Its staff and volunteers assist voters in registering, verifying their registration status, completing mail-ballot and emergency-ballot applications, and addressing barriers to voting.

17. Black voters, including those from communities the NAACP serves, have faced an extensive history of government intimidation, interference, and suppression. Black Americans, including those from communities NAACP serves, have also disproportionately faced criminal prosecution and incarceration. As a continuation of this history, Defendants' conduct is chilling the NAACP and its members from participating in the 2026 elections.

18. Plaintiff Reverend Andre Miller is the Vice President of the Arizona State Conference of the NAACP and a pastor of St. Peter Lutheran Church in Mesa, Arizona. Plaintiff Miller plans to vote in the upcoming November 3, 2026 general election and every subsequent federal election.

19. Plaintiff Nicholas Little is a Veteran and former Lieutenant in the United States Navy, and lives in Houston, Texas. Plaintiff Little plans to vote in the upcoming November 3, 2026 general election and every subsequent federal election.

20. Plaintiff Daniella Pierre is the President of the Miami-Dade County, Florida Branch of the NAACP and attorney. Plaintiff Pierre is a United States Citizen, born in the United States to parents of Haitian decent. Plaintiff Pierre plans to vote in the upcoming November 3, 2026 general election and every subsequent federal election.

21. Defendant Todd Blanche is the Attorney General and the Cabinet official in charge of the United States Department of Justice. He is sued in his official capacity.

22. Defendant U.S. Department of Justice is a cabinet-level agency in the federal government, headquartered in Washington, D.C. Its components include the Civil Rights Division, the Federal Bureau of Investigation, the U.S. Marshalls, U.S. Attorney's Offices, and other components.

23. Defendant Harmeet Dhillon is the Assistant Attorney General for the Civil Rights Division of the United States Department of Justice. Defendant Dhillon leads the Division's programs, including the 2026 Poll Monitoring Program. She is sued in her official capacity.

## **VENUE AND JURISDICTION**

24. This Court has jurisdiction under 28 U.S.C. § 1331 because this action involves a federal question arising under the laws of the United States, and 28 U.S.C. § 1343 because this

action involves federal questions related to civil rights and the elective franchise under the Voting Rights Act of 1965 ("VRA") and the Administrative Procedure Act.

25. Venue is proper under 28 U.S.C. § 1391(b) and (e) because each Defendant is an agency of the United States or an officer or employee of the United States or any agency thereof acting and sued in their official capacity, at least one Defendant resides in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

## FACTS

### I. The Justice Department Has Historically Deployed Poll Monitors to Assess State and Local Compliance with Federal Civil Rights Laws

26. The 2026 Poll Monitoring Program stands in stark contrast to the limited and carefully proscribed efforts that were made in the past to deploy monitors for the limited purpose of assessing compliance with federal civil rights laws. Defendants are undertaking a nationwide "election monitoring" effort that stands to sow chaos, promote voter intimidation, and disrupt the work of local and state election officials. Defendants have declared their plan to deploy to all 50 states. During the 2026 primary election, Defendants failed to provide notice, obtain consent and they were aggressive.

27. Defendants have conflated the Federal Observer Program set forth under the Voting Rights Act with the 2026 Poll Monitoring Program at issue in this case.

28. DOJ has traditionally deployed federal observers, in part through its Office of Personnel Management, as pursuant to its statutorily-assigned duties under the Voting Rights Act of 1965. The Justice Department can send federal observers to jurisdictions pursuant to court order based on Section 3(a) of the Voting Rights Act.

29. In 2016, the Justice Department ceased most of its Federal Observer Program work following the *Shelby County, Alabama v. Holder* decision. Today, the Department continues to

deploy a small number of federal observers pursuant to Section 3(a) of the Voting Rights Act which authorizes the appointment of federal observers by order of a federal court.[12]

30. As of 2026, there are a handful of political subdivisions eligible for the deployment federal observers under the Act.

31. In March 2026, the Defendants' Office of Personnel Management considered eliminating Congressionally-authorized funding for federal observers, "noting that it has only been used at a handful of locations since 2013."

32. The Poll Monitoring Program, which involves the informal deployment of Justice Department attorneys as election monitors, stands apart from the federal observer program authorized by the Voting Rights Act. There is no law that gives the Justice Department the authority to send monitors.

33. The Justice Department's Poll Monitoring Program was historically carried out "with one goal in mind: to see to it that every eligible voter can participate in our elections to the full extent that federal law provides."[13]

34. The purpose of the Justice Department's monitoring of elections has always been to assess state and local compliance with federal voting rights laws such as the Voting Rights Act, the Civil Rights Act, the Help America Vote Act, and the Americans with Disabilities Act.[14] Nothing more.

---

[12] Election Monitoring, U.S. Dep't of Justice (Oct. 2024), https://www.justice.gov/crt/media/1348571/dl?inline.

[13] Justice Department to Monitor Polls in 28 States on Election Day." Department of Justice's Office of Public Affairs. https://www.justice.gov/archives/opa/pr/justice-department-monitor-polls-28-states-election-day.

[14] Justice Dep't to Monitor Polls in 27 States for Compliance with Federal Voting Rights Laws, Dep't of Justice (Nov. 1 2024), https://www.justice.gov/archives/opa/pr/justice-department-monitor-polls-27-states-compliance-federal-voting-rights-laws.

35. Justice Department monitors have no independent statutory authority to enter polling places without consent from state or local election officials. Without local consent, monitors must adhere to laws, restrictions, and limits imposed on third parties. As a result, before each election, the Justice Department would notify and maintain contact with local election officials in the jurisdictions selected for monitoring.[15]

36. Federal prosecutors and other law enforcement personnel have never been permitted to serve as election observers as part of DOJ's monitoring program. In 2008, for example, the Justice Department renounced the deployment of prosecutors as monitors.[16]

37. States routinely object to the deployment of the Justice Department's election monitors. In 2024, for example, Texas sued the Justice Department to bar deployment of monitors and prevailed outside of court by securing a favorable agreement with the Department.[17]

38. Other states have opposed the deployment of election monitors, including Hawaii. This underscores a core principle of the U.S. Constitution's Elections Clause—states run elections—and makes clear why providing advance notice to monitored jurisdictions is key.

## II. Defendants are Utilizing the 2026 Poll Monitoring Program as Part of Their Law Enforcement Toolkit for Investigating Alleged Voter Fraud

39. Defendants' Poll Monitoring Program bears no resemblance to the election monitoring historically undertaken by the Civil Rights Division. Instead of protecting voting rights

---

[15] Justice Department to Monitor Polls in 28 States on Election Day." Department of Justice's Office of Public Affairs. https://www.justice.gov/archives/opa/pr/justice-department-monitor-polls-28-states-election-day; Andrew Garber & Sara Steele, Roles and Rules for the Federal Election Monitor Programs, Brennan Center for Justice (Sept. 15, 2026), https://www.brennancenter.org/our-work/research-reports/roles-and-rules-federal-election-monitor-programs.

[16] *See Feds won't send prosecutors to polls*, NBC News, September 23, 2008, https://www.nbcnews.com/id/wbna26859767.

[17] Office of the Texas Attorney General. Attorney General Ken Paxton Secures Major Victory Preventing Biden-Harris Administration From Unlawfully Sending DOJ Personnel Inside Texas Election Locations. November 5, 2025. https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-secures-major-victory-preventing-biden-harris-administration-unlawfully.

guaranteed by federal law, Defendants have twisted the Poll Monitoring Program into a tool to pursue baseless allegations of widespread voter fraud. Defendants' focus on purported voter fraud, combined with the first-time use of criminal prosecutors and the unprecedented scale of deployment, is intimidating to voters, who reasonably fear facing wrongful surveillance, investigation, or prosecution for exercising their right to vote.

40. In April 2025, Defendant Dhillon took the unusual step of sending new mission statements to sections in the Civil Rights Division. The Voting Rights Section's new mission statement made clear that its new focus would be on fraud, not on voting rights:

> The mission of the Voting Rights Section of the DOJ Civil Rights Division is to ensure free, fair, and honest elections unmarred by fraud, errors, or suspicion. The Section will work to ensure that only American citizens vote in US federal elections and do so securely. Other section priorities include preventing illegal voting, fraud, and other forms of malfeasance and error.[18]

41. In line with this new mission, Defendants have repurposed DOJ's traditional election monitoring efforts to create the 2026 Poll Monitoring Program, which chases down unverified, unproven claims of widespread voter fraud and other alleged election irregularities.

42. When discussing DOJ's poll monitoring efforts, Defendant Dhillon has invoked false and disproven theories questioning ballot security and election integrity.

43. On July 7, 2026, in announcing the DOJ's poll monitoring efforts for the 2026 primaries, Defendant Dhillon asserted that DOJ election monitors would ensure that no citizen's vote would be "canceled out" by someone who "should not be voting."[19]

---

[18] Sam Levine, *Trump ally pushes DOJ unit to shift civil rights focus, new messages show*, The Guardian (April 18, 2025), https://www.theguardian.com/us-news/2025/apr/18/justice-department-civil-rights-division-trump.

[19] Video posted by Harmeet Dhillon (@AAGDhillon), X, We @TheJusticeDept are proud to safeguard every American's right to vote — and we will continue routine, nonpartisan election monitoring that's been standard under both Republican & Democrat administrations for decades. Stay tuned for more! (July 7, 2026), https://x.com/AAGDhillon/status/2074616926941114411.

44. On the same day, Defendant Dhillon sent letters threatening election officials in all 50 states and the District of Columbia with federal criminal charges should they allow noncitizen voting to occur on their watch.[20]

45. On August 20, 2026, Defendant Dhilon stated that monitors would be deployed to locations "where there may be voter fraud issues that we've seen."[21]

46. The same day, she claimed that DOJ had identified "close to 30,000 noncitizens registered on the rolls" of states that voluntarily submitted voter information to DOJ, "some of whom have voted," and suggested, misleadingly, that votes cast by noncitizens could alter election outcomes.[22]

47. Consistent with its focus on purported voter fraud, and in a major departure from past practice, DOJ has deployed criminal prosecutors as election monitors during the 2026 election cycle.

48. For Arizona's July 21, 2026 primary election, Defendants dispatched six criminal prosecutors from the U.S. Attorney's Office of Arizona to monitor polling places in Maricopa and Pima Counties. Defendants described the purpose of the Poll Monitoring Program's deployment to these Arizona counties as "part of DOJ's efforts to . . . prevent illegal voting."[23]

---

[20] Michael Kosnar & Kyla Guilfoil, *DOJ threatens criminal charges for state election officials over noncitizen voting*, NBC News (July 8, 2026), https://www.nbcnews.com/politics/elections/doj-warns-criminal-charges-state-election-officials-non-citizen-voting-rcna353433.

[21] Bloomberg Talks: Harmeet Dhillon (Aug. 17, 2026), https://www.bloomberg.com/news/audio/2026-08-17/bloomberg-talks-harmeet-dhillon-podcast; RCPod, Harmeet Dhillon Joins to Talk Election Integrity (Aug. 20, 2026), https://music.youtube.com/watch?v=nl9ThUQpnPc&si=dp-CUllEItboIgNq&t=1080; https://www.foxnews.com/video/6406211288112.

[22] RCPod, Harmeet Dhillon Joins to Talk Election Integrity (Aug. 20, 2026), https://www.youtube.com/watch?v=nl9ThUQpnPc&t=1081s (27:15).

[23] Department of Justice, Election Integrity – Arizona, Enforcement Updates (July 21, 2026), https://www.justice.gov/crt/election-integrity-arizona (last accessed Oct. 15, 2026).

49. Defendants also sent an FBI special agent detailed to the U.S. Attorney's Office to polling places in Maricopa County for the primary election. That agent is a sworn federal law enforcement officer.

50. Defendants deployed criminal prosecutors and the FBI special agent to monitor the July 21 primary even though Arizona's U.S. Attorney's Office has a dedicated Civil Division with attorneys and professional staff who could have been deployed without violating DOJ's prior longstanding commitment to avoid sending criminal attorneys and law enforcement officials to monitor elections.

51. DOJ has dispatched a newly-hired attorney who was convicted of election crimes to conduct "election monitoring" in two states for primaries, Arizona and Minnesota.[24]

52. DOJ monitors dispatched to Minnesota for their primary did not provide notice nor work in coordination with local election officials prompting state leaders to deploy people to monitor the DOJ "election observers." This led to confusion and confrontation, captured on video, wherein DOJ personnel were documented violating Minnesota's polling place perimeter regulation and arguing with locals over the law.[25]

53. Defendants have confirmed that they intend to continue deploying criminal prosecutors as election monitors during the November general election.

---

[24] Rivas, Yunior, *DOJ Lawyer Convicted of Hacking Election Sites Monitored Voting in Maricopa County, Arizona*, Democracy Docket (October 6, 2026) https://www.democracydocket.com/news-alerts/doj-lawyer-convicted-of-hacking-election-sites-monitored-voting-in-maricopa-county-arizona/.

[25] KARE 11 News, *Federal Election Observers Make Stops at Minnesota Polls*, Video. August 11, 2026. https://www.kare11.com/video/news/local/breaking-the-news/federal-election-observers-make-stops-at-minnesota-polls/89-a31fdd0a-d511-4bdd-a941-4d4ab1a11376.

54. In an October 2026 statement, an unnamed DOJ spokesperson said all "department attorneys, including prosecutors, will serve as election monitors."[26] The spokesperson incorrectly claimed that this has happened "in many past elections."[27]

55. Incidents involving DOJ election monitors during the 2026 primary elections in Arizona, Wyoming, Virginia, and Minnesota confirm and heighten concerns about the criminal law enforcement focus of DOJ's "election monitoring" activities this midterm cycle.

56. Defendants have failed to provide notice of DOJ election monitoring activities to jurisdictions, caught officials by surprise, acted aggressively, and prevented states from being able to impose limits or wholly object to the presence of the monitors.

57. In Wyoming, Governor Mark Gordon described the Justice Department's monitors' behavior in monitoring his state's August 18, 2026 primary as "aggressive" and "irregular."[28] Governor Gordon said that the monitors' "behavior seemed to exceed what the authority that Congress had given them was."

58. Laramie County Clerk Debra Lee described DOJ monitors' actions during the primary as "show[ing] a complete disregard for our state laws and administration of elections." County Clerk Lee observed Justice Department monitors asking questions that were "outside the

[26] Jacob Knutson, *DOJ dispatched criminal prosecutors, FBI agent to monitor Arizona's primary, documents reveal*, Democracy Docket (Oct. 6, 2026), https://www.democracydocket.com/news-alerts/doj-dispatched-criminal-prosecutors-fbi-agent-to-monitor-arizonas-primary-documents-reveal/.

[27] On October 2, 2026, Plaintiff NAACP and co-counsel Advancement Project sent a letter to Eric Neff, the Acting Chief of the Voting Rights Section at the Civil Rights Division, and Harmeet Dhillon, the Assistant Attorney General of the Civil Rights Division, requesting a clear answer on whether the Department of Justice will use criminal prosecutors and other criminal law enforcement agency personnel from the DOJ as part of the "election monitors." Exhibit A. Letter to Eric Neff and Harmeet Dhillon. At the time of this filing, no response has been received.

[28] Adam Edelman, *Wyoming's Republican governor raises concerns over aggressive DOJ election monitors*, NBC News (Aug. 27, 2026), https://www.nbcnews.com/politics/2026-election/wyoming-republican-governor-concerns-aggressive-doj-election-monitors-rcna594730.

scope of federal voting rights laws," including asking about the acquisition of new election equipment and requesting to examine vote tabulators.

59. Neither the public nor state officials in Wyoming received proper notice regarding the Justice Department's plans to deploy monitors to polling sites. Wyoming Governor Gordon indicated that state and local officials had not been informed ahead of time of DOJ's plans to observe the elections. Indeed, the Justice Department did not issue a press release about its deployment of monitors to Wyoming until well into election day.

60. DOJ monitors also did not follow protocol when monitoring at polling places in Fairfax County, Virginia.

61. Three of the monitors dispatched to Fairfax County, Virginia were directly involved in efforts to overturn the results of the 2020 election.[29] One was Carol Matheis, a Program Manager with DOJ's Office of Personnel Management who worked to overturn the 2020 election in Wisconsin.[30]

62. At one Fairfax County polling place, a Justice Department monitor interrogated a voter inside the perimeter of a polling place despite having been prohibited from doing so by Fairfax County's top election official.

63. At another Fairfax County polling place, DOJ monitors asked poll workers questions about voting machines and power outages. These questions had nothing to do with the purported reason for DOJ's decision to monitor in Fairfax County, which was supposed to involve

---

[29] Cohen, Gabe and Sneed, Tierney. "Inside Trump's Plan for the 'Biggest DOJ Election Observer Effort in History." Sept. 25, 2026. https://www.cnn.com/2026/09/25/politics/trump-election-monitors-voting-machines-vis.

[30] *Id;* Federal Register, Introduction to the Unified Agenda of Federal Regulatory and Deregulatory Actions-2026. https://www.federalregister.gov/documents/2026/08/14/2026-16603/introduction-to-the-unified-agenda-of-federal-regulatory-and-deregulatory-actions-2026.

assessing compliance with the language minority provisions of Section 203 of the Voting Rights Act.

64. Defendants have announced plans to expand the Poll Monitoring Program for the November general election, deploying election monitors at an unprecedented scale.

65. Defendants have sent recruitment emails to all Department of Justice employees, heads of litigating components, and all United States Attorney Offices, which includes federal prosecutors, FBI agents, members of the U.S. Marshalls, and other law enforcement personnel, soliciting participation in the November 2026 general election as election monitors.

66. On information and belief, the scale of Defendants' 2026 Poll Monitoring Program combined with the exodus of experienced attorneys from the Civil Division since the beginning of the Trump Administration, including the departure of approximately 75 percent of the attorneys in the Civil Rights Division, will necessarily require the Poll Monitoring Program to include and deploy many individuals with little or no federal monitoring experience.

67. Additionally, by casting such a wide and indiscriminate net to recruit election monitors, Defendants have tossed aside longstanding Department policies that kept prosecutors and criminal investigations away from polling locations to avoid intimidating voters, poll workers, and election officials.

## III. Defendants' Poll Monitoring Program Intimidates Plaintiffs and Interferes with the NAACP's Organizational Mission

68. Defendants' statements and actions related to their Poll Monitoring Program have made Plaintiffs afraid of appearing at polling places to vote in person on Election Day.

69. Individual Plaintiffs and Plaintiff NAACP members have voted and plan to vote in subsequent elections, including the 2026 general election. Plaintiff NAACP and its members are engaged and plan to continue engaging in work related to the 2026 elections, including registering

members of their communities to vote, mobilizing community members to vote through get-out-the-vote efforts, assisting voters, and engaging in poll monitoring to ensure eligible voters are able to freely cast their ballots.

70. Plaintiffs fear that Defendants' 2026 Poll Monitoring Program will expose them, their members, and members of their communities to surveillance, intrusive questioning, criminal investigation, and potential prosecution if they or their members attempt to vote or help others vote in person on Election Day.

***Plaintiff NAACP***

71. The NAACP has historically opposed voter suppression efforts through outright threats and ballot denial, and efforts to make it more difficult to register voters, to vote by mail, to transport voters to the polls, to vote in person, to challenge ballots already cast, to invalidate ballots, and to overturn or otherwise discard election results that reflect the will of the voters.

72. The NAACP and its individual units have been harmed by the diversion of resources that have been required to address member and community concerns about Defendants' Poll Monitoring Program.

73. The NAACP received complaints from members during the 2026 primary elections and in the weeks preceding the 2026 general election. NAACP members have expressed grave concerns about the Justice Department's 2026 Poll Monitoring Program, including the inclusion of federal criminal prosecutors, FBI agents, and other federal personnel in that effort.

74. Each election cycle, the NAACP conducts trainings and provides voter education to members on voting rights and other topics designed to increase voter turnout. Typically, the NAACP will include information on issues such as voter suppression and intimidation. This cycle, however, the NAACP has had to divert resources to conduct additional trainings, hold voter

education programs, and develop new Know Your Rights materials to address the Justice Department's 2026 Poll Monitoring Program. The NAACP's work has focused on voter intimidation, coercion at the hands of the federal government and preparedness for federal "election monitors" who may show up announced to polling locations across the country.

75. The NAACP has state-level legal teams that work on Election Day each cycle to work on issues such as long lines at polling places, ensuring there are enough back-up paper ballots, providing notice to county and state election officials of any deviation from state law at individual precincts, and generally responding to members' calls and reporting. This election cycle, however, the NAACP is facing an unprecedented surge in members and state conferences reaching out for support on Election Day issues with concerns about how the presence of federal "election monitors" will impact their ability to cast a ballot.

76. To address the threat of intimidation created by Defendants' Poll Monitoring Program, Plaintiff NAACP recruited, identified, and trained its own monitors in states across the country to track federal election monitors during the 2026 primary election. This diversion of resources has had a significant impact on the organization's work.

77. In Virginia, NAACP-led monitors deployed to polling locations to observe and assess the conduct of Justice Department "election monitors." Some Justice Department monitors did not comply with county official instructions and interrupted the work of poll workers to inquire about topics that went beyond the scope of issues they claimed to be focused on.

78. In light of Defendants' unprecedented expansion of the Poll Monitor Program, the NAACP is continuing to divert resources to attempt to track and observe Justice Department monitors' conduct in other states. The difficulty of tracking Defendants' conduct, given their failure to provide states and the public notice of poll monitor deployments and the failure to

consistently obtain consent from election officials, has required NAACP to devote even more resources to its response efforts.

79. Black voters, including those from communities served by the NAACP have expressed concern regarding the Justice Department's plans and believe that Defendants' conduct is having a chilling effect on members across the country.

***Plaintiff Reverend Andre Miller***

80. Plaintiff Reverend Andre Miller is the Vice President and a member of the Arizona State Conference of the NAACP. He is a pastor of St. Peter Lutheran Church in Mesa, Arizona.

81. Reverend Miller is intimidated and threatened by the potential presence of DOJ poll monitors who are prosecutors and/or other law enforcement as poll monitors at his polling location.

82. Reverend Miller's church includes Black and Latino congregants who vote at the church and who have expressed concerns about the presence of federal law enforcement in their communities, including inside polling locations.

83. Reverend Miller's church served as an in-person polling site for the July 21, 2026 midterm primary election in Arizona and the church will serve as an in-person polling site for the November 3, 2026 midterm general election. As the Pastor of St. Peter Lutheran, Reverend Miller has duties that include the maintenance and upkeep of the physical structure of the church building.

84. As a result of Defendants' deployment of criminal prosecutors as "election monitors" to Arizona during the 2026 primary and Defendants' concurrent claims of election fraud, Reverend Miller determined it was unsafe for his congregants for the church to serve as an early voting site.

85. Mesa, Arizona, is located within Maricopa County.

86. DOJ routinely deploys election monitors to Maricopa County, including during the July 2026 primary election. DOJ election monitors were also deployed to Maricopa County polling places for the 2024, 2022, and 2020 general elections.

87. On information and belief, Defendants will deploy election monitors to Maricopa County polling locations for the 2026 general election. Rev. Miller is concerned that DOJ election monitors will be deployed to his church in the upcoming November general election and in future elections.

88. Reverend Miller is concerned about the palpable threat of unannounced federal criminal prosecutors and other law enforcement deploying to his church as "election monitors" and fears that Defendants' Poll Monitoring Program will lead to chaos, confusion, and intimidation while voting takes place at the church during the general election.

***<u>Plaintiff Nicholas Little</u>***

89. Plaintiff Nicholas Little is a veteran and former Lieutenant in the United States Navy, and lives in Houston, Texas.

90. Mr. Little plans to vote in-person on Election Day during the 2026 general election and every subsequent federal election. However, he feels intimidated and threatened by the planned presence of DOJ poll monitors who are prosecutors and/or other law enforcement at his polling location.

91. The Justice Department consistently sends election monitors to Harris County, which includes Houston, as part of its Poll Monitoring Program. DOJ election monitors were deployed to Harris County polling locations for the 2026 primary and the 2024, 2022, and 2020 general elections. On information and belief, Defendants will again deploy election monitors to Harris County polling locations for the 2026 general election. Mr. Little is concerned that DOJ

election monitors will be deployed to his polling location in the upcoming November general election and in future elections.

92. Mr. Little is politically active in his community and very supportive of local organizing efforts to get out the vote.

93. As a veteran of the Armed Services, Mr. Little is aware of the need for clear chains of command and the potential harm involved when multiple law enforcement agencies with separate command structures and conflicting goals are present. As a volunteer poll watcher and a pro-voting activist, Mr. Little has attended voting rights trainings specifically focused on the limitations of federal government actors on Election Day and laws in Texas designed to protect voters from intimidation such as the 100-foot perimeter surround polling sites. Mr. Little is concerned that if he sees a Justice Department poll monitor interfering with the exercise of voting and he calls local law enforcement, there could be a confrontation that disrupts the polling site and results in the delay or denial of his community members' right to vote, and even a risk to public safety.

**Plaintiff Daniella Pierre**

94. Plaintiff Daniella Pierre is a resident of Miami, Florida. She is the President of the Miami-Dade County Branch of the NAACP.

95. Plaintiff Pierre is a U.S. citizen and a registered voter in Miami-Dade County.

96. Plaintiff Pierce was born in the United States to parents of Haitian decent.

97. Plaintiff Pierre intends to vote in person on Election Day in the upcoming 2026 general election and every subsequent federal election. She feels intimidated and threatened by the potential presence of criminal prosecutors and/or other law enforcement as Justice Department poll monitors at her polling location.

98. Plaintiff Pierre is also a voting rights activist and works to get out the vote on Election Day. These activities include assisting community members get to the polling locations, monitoring election polling precincts, and responding to complaints of voter concerns.

99. As a result of the Defendants' statements promoting unfounded allegations of widespread noncitizen voting, Plaintiff Pierre is concerned that criminal prosecutors or other federal law enforcement deployed as monitors under Defendants' Poll Monitoring Program will target her for heightened scrutiny given her family's Haitian roots. Plaintiff Pierre is aware of many instances of federal law enforcement questioning, detaining, and even arresting United States citizens wrongfully supposed by federal agents to be immigrants based on immutable characteristics such as race and ethnicity. As a result, she fears that voting in person on Election Day could subject her to arrest and criminal prosecution.

100. DOJ routinely monitors elections in Miami-Dade County, including in the August 18, 2026, primary election and the 2024, 2022, and 2020 general elections. On information and belief, DOJ will again deploy election monitors to Miami-Dade County polling places for the November 2026 general election.

101. Plaintiff Pierre is concerned that DOJ election monitors will be deployed to her polling place in the upcoming November general election and in future elections.

## IV. Defendants' Use of Criminal Prosecutors, FBI Agent(s) and Threats of Criminal Prosecution Followed the Abandonment of Longstanding Policies Insulating Elections from Criminal Investigations

102. For well over forty years, the Federal Prosecution of Election Offenses Manual ("Manual") has set out DOJ's policies with respect to investigating and prosecuting election crimes.[31] Recognizing that "[t]he principal responsibility for overseeing the election process rests

[31] The Manual was first published in 1980. Memorandum from Corey R. Amundson to Attorney General Advisory Committee regarding Summary of Significant Election Related Policies ("Amundson Memorandum"), Aug. 20, 2020,

with the states," it provides that deterring election fraud must avoid "interference with the process itself."

103. The Manual specifically instructs that criminal investigations "must be conducted in a way that minimizes the likelihood that the investigation itself may become a factor in the election." As a result, "it is the general policy of the Department not to conduct overt investigations, including interviews with individual voters, until after the outcome of the election allegedly affected by the fraud is certified." The Manual further requires the Criminal Division's Public Integrity Section to approve "any investigative action that involves an intrusion by federal investigators into the area immediately surrounding an open polling place."

104. Recognizing the sensitivity of criminal investigations in the context of elections, the Manual stated that "starting a public criminal investigation of alleged election fraud before the election . . . runs the obvious risk of chilling legitimate voting and campaign activities." The Manual cautioned that even covert operations near or around polling places risked "chilling legitimate voting activity."

105. An August 22, 2020 Justice Department memorandum describing the Department's longstanding election non-interference policy specified that the Manual's prohibition on overt investigative measures included investigations related to voter fraud.[32]

106. At some time between July 2025 and March 2026, DOJ removed the Manual from its website without explanation.[33] It remains unavailable on the Justice Department's website today.

---

available at amundson-memoaugust-20-2020.pdf. The earliest edition of the manual available online is the Fourth Edition, dated October 1984. https://catalog.hathitrust.org/Record/001291421.

[32] Amundson Memorandum at 1. U.S. Department of Justice, Summary of Significant Election Related Policies, https://embed.documentcloud.org/documents/7221423-Amundson-Memo-Summary-of-Certain-Election/.

[33] Jose Pagliery, *The Justice Department Hasn't Taken Its Usual Steps to Protect the 2026 Election*, The Washington Sun (June 8, 2026), https://www.washingtonsun.com/2026-election/public-integrity-unit-doj-election-safeguards?redirected=notus_org; https://web.archive.org/web/20250713185817/https://www.justice.gov/criminal/file/1029066/dl?inline.

107. On June 8, 2026, twenty United States senators sent a letter to DOJ raising concerns about the unexplained disappearance of the Manual from DOJ's website.[34] DOJ offered no response.

108. Defendants rescinded these longstanding policies prohibiting overt criminal investigations into voter fraud until after the outcome of an election, and requiring approval before allowing federal investigators into the area immediately surrounding an open polling place, without any opportunity for public input.

109. DOJ's policy would have prohibited sending FBI agents to polling locations, which Director of the Federal Bureau of Investigation Kash Patel refused to rule out when testifying before the Senate Judiciary Committee on September 15, 2026.[35]

## V. Defendants' Efforts to Substantiate Baseless Allegations of Widespread Voter Fraud Heighten the Intimidating Impact of the Poll Monitoring Program

110. Under this Administration, the Department of Justice has directed the full weight of the federal government's prosecutorial power toward attempts to substantiate the Administration's baseless claims of widespread voter fraud and noncitizen voting. Working across Department divisions and in coordination with other law enforcement agencies, Defendants have carried out criminal investigations based on discredited fraud allegations, accused states of carrying hundreds of thousands of ineligible voters on their rolls without evidence, and publicly announced criminal voter fraud charges against individuals within weeks of the general election. Defendants' repeated and unprecedented misuse of the federal government's prosecutorial power

[34] Letter from Senator Padilla to Acting Attorney General Blanche (June 8, 2026), *available at* https://www.padilla.senate.gov/wp-content/uploads/26.06.08-Letter-to-Acting-AG-Blanche-on-Election-Offenses-Manual-Changes-FINAL.pdf

[35] Ashley Murray, *Patel won't say whether FBI agents will be at the polls this fall*, Government Executive (Sept. 15, 2026), https://www.govexec.com/management/2026/09/patel-wont-say-whether-fbi-agents-will-be-polls-fall/416002/.

to interfere with state election administration and criminally investigate and prosecute voters supercharges the intimidating, threatening, and coercive effect of Defendants' Poll Monitoring Program.

111. On January 28, 2026, the FBI seized hundreds of boxes of ballots and other election documents from Fulton County, Georgia, as part of an investigation into alleged fraud during the 2020 election. Accusations of fraud or other malfeasance by the county have been thoroughly debunked, including through multiple lawsuits.[36] DOJ retains possessions of those ballots to this day.

112. In March 2026, the FBI issued a grand jury subpoena to the Arizona State Senate related to the body's discredited, partisan audit of the vote count in Maricopa County during the 2020 presidential election. The Arizona Attorney General characterized the action as "the weaponization of federal law enforcement in service of crackpots and lies."[37]

113. On April 14, 2026, Defendant Dhillon sent a letter to the chief election official of Wayne County, Michigan requesting that she produce all ballots, ballot receipts, and ballot envelopes from the November 2024 federal election based on unsubstantiated allegations that a Michigan state court and a Republican-led legislative oversight committee had already investigated and rejected as "not credible."[38]

---

[36] *Fulton County Asks Court to Return 2020 Election Documents Seized By The FBI.* https://www.pbs.org/newshour/politics/fulton-county-asks-court-to-return-2020-election-documents-seized-by-the-fbi (Feb, 4, 2026)

[37] Alan Feuer, Nick Corasaniti and Glenn Thrush, *F.B.I. Subpoenas Records in Arizona in Expansion of 2020 Voting Inquiry*, N.Y. Times (March 9, 2026), https://www.nytimes.com/2026/03/09/nyregion/fbi-subpoena-arizona-maricopa-county-election.html.

[38] Brentin Mock, DOJ civil rights chief sends demand letter to Wayne County for 2024 ballots, Democracy Docket (Apr. 19, 2026), https://www.democracydocket.com/news-alerts/doj-civil-rights-chief-sends-demand-letter-to-wayne-county-for-2024-ballots/.

114. DOJ's Civil Rights Division has sued 30 states and the District of Columbia seeking copies of their voter rolls, including voters' highly sensitive personally identifiable information like birth dates, Social Security numbers, and driver's license numbers.[39] DOJ initially said that it needed this data to confirm compliance with federal requirements to maintain accurate voter rolls,[40] but DOJ has since confirmed that it planned to share the voter roll data with Immigration and Customs Enforcement's Homeland Security Investigations to investigate and prosecute noncitizens who had registered to vote or cast ballots in prior elections.[41]

115. DOJ has lost every case adjudicated thus far: 26 federal district courts and one circuit court of appeals have universally rejected DOJ's demands for state voter roll data.[42] Many of these district courts found that the DOJ's asserted need to confirm state compliance with federal laws governing voter roll maintenance was pretextual and that its true purpose in seeking these records is for immigration enforcement and "to advance unsubstantiated claims of non-citizen voting." *See, e.g.*, *United States v. Schmidt*, 835 F. Supp. 3d 697, 699-700 (W.D. Pa. 2026); *United States v. Oregon*, 828 F. Supp. 3d 1092, 1106-07 (D. Or. 2026); *United States v. Weber*, 816 F. Supp. 3d 1168, 1185-86 (C.D. Cal. 2026). One court characterized DOJ's actions as "antithetical

[39] Tracker: DOJ Lawsuits Seeking States' Sensitive Voter Data, State Democracy Research Initiative, University of Wisconsin Law School, https://statedemocracy.law.wisc.edu/our-work/tracker-doj-lawsuits-seeking-states-sensitive-voter-data

[40] *See*, *e.g.*, Press Release, U.S. Dep't of Just., *Justice Department Sues Oregon and Maine for Failure to Provide Voter Registration Rolls (Sept. 16, 2025),* https://www.justice.gov/opa/pr/justice-department-sues-oregon-and-maine-failure-provide-voter-registration-rolls*;* Press Release, U.S. Dep't of Just., *Justice Department Sues Six States for Failure to Provide Voter Registration Rolls (Sept. 25, 2025),* https://www.justice.gov/opa/pr/justice-department-sues-six-states-failure-provide-voter-registration-rolls.

[41] Sarah N. Lynch, *Justice Dept. Close to Finalizing Deal to Hand Over States' Voter Roll Data to Homeland Security, Sources Say*, CBS News (Mar. 26, 2026, at 17:43 EDT), https://www.cbsnews.com/news/justice-dept-finalizing-deal-voter-roll-data-homeland-security/; Jude Joffe-Block, *The Justice Department Plan to Share Sensitive Voter Data with Homeland Security*, NPR (Mar. 27, 2026, at 17:53 ET), https://www.npr.org/2026/03/27/nx-s1-5764266/voter-data-trump-doj-dhs.

[42] Tracker: DOJ Lawsuits Seeking States' Sensitive Voter Data, State Democracy Research Initiative, University of Wisconsin Law School, https://statedemocracy.law.wisc.edu/our-work/tracker-doj-lawsuits-seeking-states-sensitive-voter-data

to the promise of fair and free elections our country promises and the franchise that civil rights leaders fought and died for." *Weber*, 816 F. Supp. 3d at 1176.

116. Beginning in June 2026, the FBI issued seven subpoenas to the Nevada Secretary of State seeking voter information.[43]

117. Contrary to the longstanding policy insulating elections from criminal investigations and prosecutions discussed in Section IV, *supra*, Defendants have in recent weeks repeatedly announced charges against individuals (described as "aliens") accused of election-related crimes in Minnesota and other states around the country.[44]

118. On October 13, 2026, Trent McCotter, the acting Deputy Attorney General, sent California election officials a letter demanding that they review and act on a list of voters that the federal government "believes are likely noncitizens" within 48 hours.[45] Two days later, on October 15, 2026, the Justice Department filed a civil suit against the State of California seeking an injunction that would prohibit California from counting mail ballots received from anyone on the federal government's list of "suspected" noncitizen voters. The Justice Department's demands conflict with the National Voter Registration Act, which prohibits systematic efforts to remove voters from the rolls within ninety days of an election.

119. Defendants' unprecedented efforts to investigate purported voter fraud are being undertaken in collaboration with DHS, which has diverted its main criminal investigation arm

---

[43] Kaanita Iyer, *Justice Department has issued subpoenas for Nevada voter data, state's elections chief says*, CNN (Sept. 5, 2026), https://www.cnn.com/2026/09/05/politics/doj-subpoena-nevada-election-midterm-voter.

[44] https://www.justice.gov/opa/pr/department-justice-indicts-ten-aliens-voter-fraud-minnesota; https://www.justice.gov/opa/pr/justice-department-announces-charges-involving-16-aliens-election-crimes; https://www.justice.gov/opa/pr/justice-department-announces-charges-involving-16-individuals-election-crimes.

[45] https://www.reuters.com/world/us-justice-department-threatens-california-over-alleged-noncitizen-voters-letter-2026-10-14/; https://www.documentcloud.org/documents/28812869-october-13-doj-letter-to-los-angeles-county-on-alleged-noncitizen-voting/

away from human trafficking investigations to focus on investigating noncitizen voting. The Civil Rights Division's website now includes a new "Enforcement Actions to Safeguard Election Integrity" webpage, which is described as "[a] joint initiative of the U.S. Department of Justice and Department of Homeland Security."[46] In short, the Civil Rights Division arrogated to itself a new mission of policing "election integrity" alongside the Department of Homeland Security.

120. On July 16, 2026, President Trump claimed that DHS had identified "approximately 278,000 non-citizens who are registered to vote in federal elections." The next day, DHS Secretary Markwayne Mullin repeated the claim, stating that DHS had identified "over 250,000 potentially noncitizens illegally registered to vote in just four U.S. states." DHS has yet to provide evidence for its claim or provide the methodology it used to come up with those numbers.

121. DHS's purported noncitizen voters included nearly 16,000 Nevadans. That number was later reduced to 185 and then finally to zero.[47]

122. In September 2026, the Department of Homeland Security launched a "surge" in its efforts to investigate voter fraud "and support timely prosecutorial review."[48] DHS referred to these efforts as the "Unlawful Voter Initiative," an attempt to identify non-citizen voters for possible referral for criminal investigation using incomplete and unverifiable data drawn from millions of records.[49]

---

[46] Dept. Of Justice Civil Rights Division. Election Integrity. https://civilrights.justice.gov/electionintegrity. (Accessed Sept. 29, 2026).

[47] Nick Corasaniti, *From 16,000 to 185 to Zero: Trump's Claims of Illegal Voting in Nevada Fizzle*, N.Y. Times (Sept. 24, 2026), https://www.nytimes.com/2026/09/24/us/politics/nevada-voters-homeland-security-trump.html.

[48] Gabe Cohen, Jeremy Herb, and Tierney Sneed, *Exclusive: DHS plans to launch voter fraud investigation surge Tuesday*, CNN (Aug. 31, 2026), https://www.cnn.com/2026/08/31/politics/homeland-security-voter-fraud-investigations.

[49] Senate Whistleblower Letter to DHS and USCIS (Sept. 13, 2026) (www.democrats.senate.gov/imo/media/doc/091326__senate_whistleblower_letter_dhs_uscis_combined_signedpdf.pdf); Gabe Cohen, Jeremy Herb, and Tierney Sneed, *ICE reviewed tens of millions of voter records looking for noncitizen voters, records show*, CNN (Oct. 7, 2026), https://www.cnn.com/2026/10/07/politics/dhs-ice-voter-fraud-investigation-undercover.

## CLAIMS FOR RELIEF

### COUNT I
### Voter Intimidation of Individual Voters
### Section 11(b) of the Voting Rights Act (52 U.S.C. § 10307(b)) and 42 U.S.C. § 1983

123. All preceding allegations contained in this complaint are reasserted and incorporated into this cause of action.

124. Section 11(b) of the Voting Rights Act ("Section 11(b)") provides that:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote[.]

52 U.S.C. § 10307(b). "Voting" is defined by the VRA as "all action necessary to make a vote effective in any . . . election, including, but not limited to registration, casting a ballot, . . . and having such ballot counted properly and included in the appropriate totals." 52 U.S.C. § 10310(c)(1).

125. Section 11(b) targets the individual person acting or attempting to act unlawfully, and contemplates actions taken both in private capacity and "under color of law" in a person's official capacity. The unlawful actions of a government official or agency are covered under Section 11(b) the same as the unlawful actions of a private party.

126. Section 11(b) exists to prevent precisely the kind of intimidation Defendants have engaged in through the Poll Monitoring Program and their related statements and actions. The statute reflects Congress's recognition that the right to vote can be suppressed not only through physical threats at the polls, but also by official surveillance, discriminatory enforcement, and the specter of governmental violence near the polls. Throughout our Nation's history, armed officials and state-backed actors have used threats to discourage and suppress political participation by

Black voters and other targeted groups. That history gives the present-day threats of criminal investigation and prosecution special weight.

127. Voter intimidation encompasses both blatant forms of coercion like acts or threats of violence, *see Paynes v. Lee*, 377 F.2d 61, 63 (5th Cir. 1967), and more subtle "actions that inspire fear of economic harm, legal repercussions, privacy violations, and even surveillance," *Ariz. All. for Retired Americans v. Clean Elections USA*, 638 F. Supp. 3d 1033, 1041 (D. Ariz. 2022).

128. Defendants' public statements and actions related to the Poll Monitoring Program are intimidating to Plaintiffs. As set forth above, Defendants' statements and actions have resulted in the intimidation of voters in connection with the 2026 general election. This intimidation will continue if Defendants' Poll Monitoring Program is not enjoined.

129. Plaintiffs are, or represent, lawfully registered voters who intend to vote in the 2026 elections or are urging or aiding individuals to vote.

130. Defendants' conduct has caused Plaintiffs and their members to reasonably fear that they will encounter federal prosecutors or other criminal law enforcement officials and be subjected to wrongful arrest, criminal investigation, prosecution, or other legal repercussions when they vote or urge or aid people to vote, in violation of Section 11(b).

131. Defendants' conduct has caused Plaintiffs and their members to reasonably fear they will be subjected to surveillance when they vote or help voters in violation of Section 11(b).

## COUNT II

### Violation of the Administrative Procedure Act: Arbitrary and Capricious and Contrary to Law, 5 U.S.C. § 706(2)(A) Rescission of Federal Prosecution of Election Offenses Policy

132. All preceding allegations contained in this complaint are reasserted and incorporated into this cause of action.

133. Under the Administrative Procedure Act (APA), reviewing courts will "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

134. The Federal Prosecution of Election Offenses manual published by the Public Integrity Section of the Criminal Division for decades set out the DOJ's established policy prohibiting overt criminal investigations in connection with an election until the election had been certified.

135. Defendants failed to engage in a reasoned decision-making process before scrapping DOJ's policy limiting the conduct of criminal investigations in the sensitive context of elections, as set out in the manual. Defendants did not seek or allow for public comment or other engagement, consider the likely effect of allowing criminal law enforcement to be deployed to polling locations while voting is in progress, including whether such presence is permitted under relevant state laws, or explain their decisions.

136. Additionally, deploying criminal prosecutors to serve as poll monitors violates the Voting Rights Act, 52 U.S.C. § 10307(b), because the threat of criminal prosecution intimidates voters and election officials.

137. For these reasons, the rescission of DOJ's policy prohibiting overt criminal investigations into fraud until after certification of the election is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A). It should, accordingly, be held unlawful and "set aside." *Id.* § 706(2).

## PRAYER FOR RELIEF

To remedy these violations, Plaintiffs respectfully request that the Court:

i. Declare that Defendants have engaged in conduct and threats in violation of Section 11(b) of the Voting Rights Act and the Administrative Procedure Act.

ii. Issue an injunction requiring Defendants, and anyone acting on behalf of Defendants or in concert with them, to cease threats to use DOJ monitors to interfere with the midterm elections and intimidate Plaintiffs Miller, Pierre, and Little, members of Plaintiff NAACP, and other similarly situated voters.

iii. Enjoin Defendants' unlawful recruitment and deployment of criminal prosecutors, DOJ law enforcement agents, and any other criminal enforcement personnel as DOJ election monitors during any election.

iv. Require Defendants to provide a report to this Court that details the specific jurisdictions selected for monitoring; copies of notice issued to jurisdiction requesting consent to deploy "election monitors;" copies of consent, if any, provided by the selected jurisdictions; copies of notice issued to the public identifying the final list of jurisdictions that have consented to "election monitor;" a list of the federal civil rights statutes that will be the focus of any such monitoring; certification that the DOJ is providing training to individual monitors on state law concerning the limitations of third-party actors at polling sites; and certification that DOJ monitors will comply with the respective state law(s) on third-party actors at polling sites.

v. Enjoin Defendants' unlawful operational plan to threaten or to deploy and use DOJ monitors to interfere with the midterm elections and intimidate Plaintiffs and other similarly situated voters, including to use monitors for law enforcement purposes, to curtail access to voting locations, or challenging individual voter qualifications for voting.

vi. Award attorney's fees, costs, and expenses incurred in this action; and

vii. Grant such other relief as this Court may deem just and proper.

DATED: October 16, 2026

Respectfully submitted,

*/s/ John Powers*

John Powers (DC Bar No. 1024831)
Hani Mirza*
Peter Ketcham-Colwill*
ADVANCEMENT PROJECT
1220 L Street NW, Suite 850
Washington, DC 20005
Phone: 202-728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org
pketchamcolwill@advancementproject.org

Kristen Clarke*
Max L. Meyers*
Anthony Ashton
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
4805 Mt. Hope Drive
Baltimore, MD 20215
Phone: 480-580-5777
kclarke@naacpnet.org
mmeyers@naacpnet.org
aashton@naacpnet.org

* Motion for admission *pro hac vice* forthcoming