**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE,
4805 Mt. Hope Drive
Baltimore, MD 20215,

REVEREND ANDRE MILLER, NICHOLAS LITTLE, and DANIELLA PIERRE,

*Plaintiffs*,

vs.

TODD BLANCHE, in his official capacity as Attorney General of the U.S. Department of Justice
U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Ave. NW
Washington, D.C. 20530,

HARMEET DHILLON, in her official capacity as Assistant Attorney General of the Civil Rights Division of the U.S. Department of Justice
U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Ave. NW
Washington, D.C. 20530,

U.S. DEPARTMENT OF JUSTICE,
950 Pennsylvania Ave. NW
Washington, D.C. 20530

*Defendants*.

**Civil Action No. 26-3626**

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………………………………..iii

INTRODUCTION…………………………………………………....……………………1

RECENT FACTUAL BACKGROUND………………………………..…………………..4

ARGUMENT………………………………………………………………………… ……12

I. Plaintiffs Are Likely to Succeed On the Merits……………………………………….13

A. Defendants' Conduct Violates Section 11(b) of the Voting Rights Act………..13

1. 11(b) Prohibits All Forms of Intimidation or Attempted Intimidation in Voting, Based on an Objective Standard……………………………...13

2. Defendants' Conduct Is at the Core of What 11(b) Was Intended to Prohibit……………………………………………………………………...15

3. Defendants' Statements Targeting the Voting Process Are Intimidating …………………………………………………………………………16

4. Defendants' Plans to Deploy Federal Law Enforcement Personnel to Monitoring Polls Is Intimidating………………………………………17

II. Plaintiffs Are Already Suffering and Will Continue to Suffer Irreparable Harm in the Absence of a Preliminary Injunction…………………………………………………….20

III. The Balance of the Equities and Public Interest Favor an Injunction Here, Especially Where the Fundamental Right to Vote is at Stake……………………………………….24

IV. The Public Interest Favors Ensuring Eligible Voters Are Not Intimidated or Prevented from Casting Their Ballots by the Active Deployment of Federal Law Enforcement Agents, Investigators, and Personnel Near Polling Places or by the Interference of Such Federal Officials with the Conduct of the Election…………………………………...24

A. An Injunction Will Not Prevent Defendants from Carrying out Legitimate Law Enforcement Activities………………………………………………………………25

**TABLE OF AUTHORITIES**

**Cases**

*ACLU of Michigan v. Does 1-6*, 755 F. Supp. 3d 1003 (E.D. Mich. 2024)…………………......18

*Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758 (2021) …………….. 24

*Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772 (M.D.N.C. Jun. 2, 2021)....3, 22

*Ariz. All. for Retired Americans v. Clean Elections USA*, No. 22 Civ. 1823, 2022 WL 17088041, at *2 (D. Ariz. Nov. 1, 2022)……………………………………………………...15

*Burson v. Freeman*, 504 U.S. 191, 199 (1992)……………………………………………….25

*Cal. Nurses Ass'n v. Mullin*, No. 26-cv-10680, 2026 WL 3166149, at *9 (N.D. Cal. Oct. 21, 2026) ……………………………………………………………………21, 18, 23

*Council on Am.-Islamic Relations Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371 (D. Minn. 2020)……………………………………………………………………18, 22

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 578-79 (D.N.J. 2009), *aff'd* 673 F.3d 192 (3d Cir. 2012), *cert. denied* 133 S. Ct. 1471 (2013)…………………13

*Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024)………………………….24

*Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 353 (E.D. La. 1965)……..15

*Kennedy v. Meta Platforms, Inc.*, No. 3:24-CV-02869-WHO, 2024 WL 4031486, at *6 (N.D. Cal. Sept. 3, 2024) ……………………………………………………………. 14, 16

*League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018)….14, 15

*League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016)……………………… 22, 24

*Martinez-Andino v. U.S. Dep't of Homeland Security*, No. 26-1208, 2026 WL 2140430, (D.D.C. July 25, 2026)……………………………………………………………...21

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992)……………………………….18

*Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457 (S.D.N.Y. 2020)…………………………………………………………...……………..14-21

*New York v. Admin. for Children & Families*, 833 F. Supp. 3d 361 (S.D.N.Y. Mar.10, 2026)…21

*Nken v. Holder*, 556 U.S. 418 (2009)……………………………………………………………24

*Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012))…………………………………….25

*Open Communities All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017)……………………….. 26

*Pablo Sequen v. Albarran*, 814 F. Supp. 3d 1005 (N.D. Cal. 2025)…………………………….23

*Rhodes v. Siver*, Civ. No. 19-12550, 2021 WL 1565137 (E.D. Mich. Feb. 1, 2021) ..………….16

*Service Employees Int'l Union, AFL-CIO v. U.S. Dep't of Justice*, No. 3:26-cv-12800 (N.D. Cal. Oct. 30, 2026)…………………………………………………………...21

*Sterling Comm. Credit—Mich., LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8 (D.D.C. 2011)……………………………..…………………………………………………….13

*United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965)……………………………..………14, 15

*United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967)……………………………………..16, 20

*Venegas v. Homan*, 25-cv-00397, 2026 WL 2822069 (S.D. Ala. Sept. 21, 2026)…...................24

*Wesberry v. Sanders*, 376 U.S. 1, 17 (1964)……………………………………………………..24

*Whatley v. City of Vidalia*, 399 F.2d 521 (5th Cir. 1968)……………………………………….14

*Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968)…………………………………………………22

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)………………………………………13

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886)……………………………………………………….22

**Statutes**

18 U.S.C. § 592…………………………………………………………………………………..21

52 U.S.C. § 10101(b)……………………………………………………………………………13

52 U.S.C. § 10307(b)…………………………………………………………………………….13

52 U.S.C. § 10310(c)…………………………………………………………………………….12

Cal. Elec. Code § 15101………………………………………………………………………….5

**Other Authorities**

*Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary*, 89th Cong. 12 (1965) (statement of Nicholas Katzenbach, Att'y Gen. of the United States)…………………………..14

Adam Edelman, *Wyoming's Republican governor raises concerns over aggressive DOJ election monitors*, NBC News (Aug. 27, 2026), https://www.nbcnews.com/politics/2026-election/wyoming-republican-governor-concerns-aggressive-doj-election-monitors-rcna594730.........................................................................................................................2

Bloomberg Talks: Harmeet Dhillon (Aug. 17, 2026), https://www.bloomberg.com/news/audio/2026-08-17/bloomberg-talks-harmeet-dhillon-podcast; RCPod, Harmeet Dhillon Joins to Talk Election Integrity (Aug. 20, 2026)……………………16

Lynn Bonner, "*US Justice Department to Send Election Monitors to These NC Counties*," NC Newsline (Oct. 28, 2026), https://ncnewsline.com/2026/10/28/us-justice-department-to-send-election-monitors-to-these-nc-counties/.........................................................................................10

Colter Anstaett, "*Virginia Beach Electoral Board votes to bar neutral observers from polls days before Election Day*," WTKR News 3 (Oct. 30, 2026) https://www.wtkr.com/news/in-the-community/virginia-beach/virginia-beach-electoral-board-votes-to-bar-neutral-observers-from-polls-days-before-election-day...........................................................................................17

Department of Justice, Office of Inspector General, Management Advisory Memorandum, Notification of Concerns Regarding the Federal Bureau of Prisons Providing Credentials with Law Enforcement Officer Markings and Badges to Employees That Are Not Authorized to Carry Firearms, 26-056, https://oig.justice.gov/sites/default/files/reports/26-056.pdf (Last accessed Nov. 1, 2026)…………………………………………………………………………….4

Election Monitoring, U.S. Dep't of Justice (Oct. 2024), https://www.justice.gov/crt/media/1348571/dl?inline.............................................................5

Federal Law Enforcement Training Centers, Training Catalog, https://www.fletc.gov/training-catalog (Last accessed Nov. 1, 2026)…………………………………………………………3

*Feds won't send prosecutors to polls*, NBC News, September 23, 2008, https://www.nbcnews.com/id/wbna26859767..................................................................................6

Francisco Diaz, LinkedIn, https://lnkd.in/p/edPPad8T. Last accessed Nov. 1, 2026……………7

Jessica Huseman, "*DOJ Again Warns Election Officials of Potential Criminal Prosecution, Days Before Midterm Elections*," Vote Beat (Oct. 30, 2026). https://www.votebeat.org/national/2026/10/30/doj-election-officials-criminal-prosecution-letters-2026-midterms/........................................................................................................................17

Jacob Bobage and Andrew Goudsward, "*US Justice Department Threatens California Over Alleges Noncitizen Voters, Letters Show*," Reuters (Oct. 14, 2026),

https://www.reuters.com/world/us-justice-department-threatens-california-over-alleged-noncitizen-voters-letter-2026-10-14/........................................................................................5

Jacob Knutson, *"DOJ dispatched criminal prosecutors, FBI agent to monitor Arizona's primary, documents reveal,"* Democracy Docket (Oct. 6, 2026), https://www.democracydocket.com/news-alerts/doj-dispatched-criminalprosecutors-fbi-agent-to-monitor-arizonas-primary-documents-reveal/...............................................................................17

Jasper Ward, *"Trump Threatens California Officials With Imprisonment Over Stance on Mail Ballots,"* Reuters (Oct. 16, 2026, Updated Oct. 19, 2026), https://www.reuters.com/world/us/trump-threatens-california-officials-with-imprisonment-over-stance-mail-ballots-2026-10-17/...............................................................................................5

Jen Rice, 'I Will Hunt You Down': U.S. Attorney Baselessly Threatens Voters as Polls Open in Texas, Democracy Docket (Oct. 19, 2026), https://perma.cc/2NN4-4YM8................................2

Justice Department to Monitor Polls in 28 States on Election Day." Department of Justice's Office of Public Affairs. https://www.justice.gov/archives/opa/pr/justice-department-monitor-polls-28-states-election-day.............................................................................................5

Justice Dep't to Monitor Polls in 27 States for Compliance with Federal Voting Rights Laws, Dep't of Justice (Nov. 1 2024), https://www.justice.gov/archives/opa/pr/justice-department-monitor-polls-27-states-compliance-federal-voting-rights-laws................................................5, 7

Justice Department to Monitor Polls in 28 States on Election Day." Department of Justice's Office of Public Affairs. https://www.justice.gov/archives/opa/pr/justice-department-monitor-polls-28-states-election-day; Andrew Garber & Sara Steele, Roles and Rules for the Federal Election Monitor Programs, Brennan Center for Justice (Sept. 15, 2026), https://www.brennancenter.org/our-work/research-reports/roles-and-rules-federal-election-monitor-programs............................................................................................................................6

Kamarck, Elaine, *"Why Do So Few Noncitizens Try to Vote?"* Brookings (July 23, 2026) https://www.brookings.edu/articles/why-do-so-few-noncitizens-try-to-vote/............................26

Office of the Texas Attorney General. Attorney General Ken Paxton Secures Major Victory Preventing Biden-Harris Administration From Unlawfully Sending DOJ Personnel Inside Texas Election Locations. November 5, 2025. https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-secures-major-victory-preventing-biden-harris-administration-unlawfully.....................................................6

Press Release, Francisco Diaz, County Clerk, Recorder & Registrar of Voters, Registrar of Voters Reaffirms Commitment to Voter Privacy and Lawful Process Following Department of Justice Demand (Oct. 24, 2026), *available at* https://lnkd.in/p/e4vyvntg...................................6

Reichlin-Melnick, Aaron, *"Unpacking Myths About Noncitizen Voting—How Heritage Foundation's Own Data Still Proves It's Not the Problem It's Made Out to Be,"* American

Immigration Council (Aug. 13, 2026) https://www.americanimmigrationcouncil.org/blog/myths-about-noncitizen-voting-heritage-foundation-data/......................................................................23

Young, Chris, "*Elections Officials Probe Report of Federal Immigration Agents Outside Key Largo Polling Site*," WLRN (Oct. 27, 2026). https://www.wlrn.org/government-politics/2026-10-27/elections-officials-probe-report-of-federal-immigration-agents-outside-key-largo-polling-site..........................................................................................................................................7

## INTRODUCTION

In less than 36 hours, Americans will head to the polls to cast ballots for the 2026 general election, and for the first time ever, they face the risk of encountering federal law enforcement agents and criminal prosecutors at polling places. On October 28th, the Department of Justice ("DOJ") confirmed that it will deploy personnel from federal law enforcement agencies including the Bureau of Prisons ("BOP"), Drug Enforcement Administration ("DEA"), and the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") to polling sites across the country as poll monitors. These are law enforcement agencies with sworn law enforcement officers, who carry the authority to investigate, detain and arrest even when they do not have a firearm or wear law enforcement uniforms. DOJ has long trained civil servants to serve as poll monitors to document instances of racial discrimination or harassment from election officials. But never before has DOJ recruited poll monitors from federal law enforcement agencies. DOJ's decision to deploy federal law enforcement agents and personnel to election sites is unlawful and serves a plain purpose: to intimidate voters and election workers alike, and to have a chilling effect on in-person voting on Election Day. Voters are already experiencing this intimidation and will continue to. DOJ's actions are contrary to the principles that shape our system of democracy and fair elections and impede the fundamental right to vote free from fear.

Consistent with these efforts to use federal law enforcement as an instrument to influence the election, Defendant Attorney General Blanche and DOJ have actively undertaken efforts to intimidate voters, and to coerce and intimidate election officials through a series of federal criminal investigations and federal lawsuits. Collectively, these actions are in direct conflict with the DOJ's decades-old policy that discourages opening criminal investigations or otherwise undertaking

election-related enforcement activity in the period immediately preceding an election. These actions contribute to the current climate of intimidation impacting voters and election officials.

The federal law enforcement agents and personnel DOJ is deploying do not belong at the polls. They are not trained to conduct poll monitoring. Federal law enforcement agents and personnel, in the ordinary course of their work, are authorized to carry weapons, wear badges and collar pins, wear vests, are outfitted with surveillance equipment and more. Their presence has long been prohibited from polling sites through in and for good reason. Federal law enforcement agents, regardless of component, have an unavoidably intimidating effect on the electorate. Absent relief from this Court, their unchecked deployment to polling sites stands to deter and discourage in-person participation in the general election.

Plaintiffs, the NAACP, its members, and the individual Plaintiff voters are experiencing ongoing and increasing intimidation from federal law enforcement officials, including threats to criminally investigate and prosecute voters. For example, on October 19, 2026, the first day of early voting in Texas, U.S. Attorney for the Southern District of Texas Aaron Reitz posted a video on social media threatening to "hunt . . . down and prosecute" voters *and* local election officials alike engaged in purported fraud, and vowing to make sure "crooked local election administrators . . . do their job."[1] Concerns about voter intimidation during the general election are not speculative but are real and substantiated. Defendants deployed federal law enforcement agents to polling sites during the primary election and during the early voting period.[2] Moreover, the specter of federal

---

[1] Jen Rice, 'I Will Hunt You Down': U.S. Attorney Baselessly Threatens Voters as Polls Open in Texas, Democracy Docket (Oct. 19, 2026), https://perma.cc/2NN4-4YM8

[2] See e.g. Adam Edelman, *Wyoming's Republican governor raises concerns over aggressive DOJ election monitors*, NBC News (Aug. 27, 2026), https://www.nbcnews.com/politics/2026-election/wyoming-republican-governor-concerns-aggressive-doj-election-monitors-rcna594730.

law enforcement engagement has arisen as DOJ has announced efforts to "hunt" for purported voter fraud. DOJ's plan to deploy federal law enforcement agents and personnel as part of its in-person Election Day monitoring plan marks a significant escalation in its activity; these plans are intimidating Plaintiffs, voters and election workers, and have a chilling effect likely to deter in-person voting on Election Day, all in clear violation of Section 11(b) of the Voting Rights Act.

Deployment of federal law enforcement agents or personnel is not authorized by law. No congressional statute supports such deployment and numerous state statutes expressly proscribe the exact conduct at issue here. And the deployment of any staff from BOP, DEA or ATF, presents the risk of armed federal law enforcement agents inside polling places watching, surveilling, and interacting with voters and election workers, posing a grave intimidation threat. Moreover, while Defendants have claimed that they will not deploy agents from the Federal Bureau of Investigation ("FBI") or Immigration and Customs Enforcement ("ICE"), ordinary voters have no way to distinguish one federal law enforcement official from the other. *See* Ex. G O'Leary Declaration at ¶10. DOJ has not trained these law enforcement personnel to conduct the familiar form of poll monitoring. Instead, DOJ is training them to project a commanding presence, to systematically scan crowds, to maintain a tactical stance, to surveil surroundings and more. Such actions inherently create an intimidating environment inside the confines of a polling place, especially for communities of color in places like Alamance County and elsewhere who have historically faced disparate treatment by law enforcement.[3] *See, e.g., Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772, at *8 (M.D.N.C. June 2, 2021) (describing a 2020 incident where the Alamance County Sherrif allegedly pepper sprayed Black voters marching to the polls).

---

[3] *See* Federal Law Enforcement Training Centers. <u>Training Catalog</u>. https://www.fletc.gov/training-catalog. (Last accessed Nov. 1, 2026).

The Defendants' plans to deploy BOP agents raises an even heightened threat level. As a recent DOJ, Office of Inspector General's Office report confirmed, virtually every single employee at BOP has "badges and law enforcement credentials" and every BOP employee is "considered [to be a] primary or secondary law enforcement officer[]" and has "Credentials with law enforcement markings and badges" that signify that the holder is "authorized by their agency to carry a firearm."[4] The Inspectors General's Office has raised significant concerns regarding the propriety of BOP agents' access to arms and sounded an alarm regarding the fact that many BOP agents may have "obtained [their] firearm in connection with illegal conduct." Id. Notwithstanding the seriousness of the Inspector General's findings and the ongoing work to address the findings set forth in the report, BOP agents, whether armed unlawfully or lawfully, have no place inside our polling sites. Plaintiffs experience intimidation irrespective of the agency the official comes from: civilians have no way to distinguish an ICE or FBI agent from a BOP, ATF or DEA agent. Simply put, Defendants' plans to deploy any federal law enforcement agent, investigator or personnel for the November 3, 2026, general election constitutes unlawful voter intimidation.

Plaintiffs respectfully seek a temporary restraining order and preliminary injunction to enjoin Defendants from departing from its policy of prohibiting deployment of federal law enforcement agents and staff, and halt their intimidation of, and resulting interference with, the Plaintiffs' exercise of the right to vote in person during upcoming election.[5]

---

[4] Department of Justice, Office of Inspector General. Management Advisory Memorandum, Notification of Concerns Regarding the Federal Bureau of Prisons Providing Credentials with Law Enforcement Officer Markings and Badges to Employees That Are Not Authorized to Carry Firearms, 26-056. https://oig.justice.gov/sites/default/files/reports/26-056.pdf (Last accessed Nov. 1, 2026).

[5] Plaintiffs maintain the original claim from their Complaint regarding the alleged violation of the Administrative Procedure Act based also on the deployment of criminal prosecutors. Given the urgent nature of issue of criminal enforcement agency personnel now included in the monitoring program, the instant TRO focuses on the latter issue.

## RECENT FACTUAL BACKGROUND

The 2026 Poll Monitoring Program stands in stark contrast to the limited and carefully proscribed efforts that were made in the past to deploy monitors for the limited purpose of assessing compliance with federal civil rights laws. Defendants are undertaking a nationwide "election monitoring" effort that stands to sow chaos, promote voter intimidation, and disrupt the work of local and state election officials. Defendants have declared their plan to deploy to all 50 states. During the 2026 primary election, Defendants failed to provide notice, obtain consent and they were aggressive.

In 2016, the Justice Department ceased most of its Federal Observer Program work following the *Shelby County, Alabama v. Holder* decision. Today, the Department continues to deploy a small number of federal observers pursuant to Section 3(a) of the Voting Rights Act which authorizes the appointment of federal observers by order of a federal court.[6]

The Poll Monitoring Program, which involves the informal deployment of Justice Department attorneys as election monitors, stands apart from the federal observer program authorized by the Voting Rights Act. There is no law that gives the Justice Department the authority to send monitors. The Justice Department's Poll Monitoring Program was historically carried out "with one goal in mind: to see to it that every eligible voter can participate in our elections to the full extent that federal law provides."[7]

The purpose of the Justice Department's monitoring of elections has always been to assess state and local compliance with federal voting rights laws such as the Voting Rights Act, the Civil

---

[6] Election Monitoring, U.S. Dep't of Justice (Oct. 2024), https://www.justice.gov/crt/media/1348571/dl?inline.

[7] Justice Department to Monitor Polls in 28 States on Election Day." Department of Justice's Office of Public Affairs. https://www.justice.gov/archives/opa/pr/justice-department-monitor-polls-28-states-election-day.

Rights Act, the Help America Vote Act, and the Americans with Disabilities Act.[8] Nothing more. Federal prosecutors and other law enforcement personnel have never been permitted to serve as election observers as part of DOJ's monitoring program. In 2008, for example, the Justice Department renounced the deployment of prosecutors as monitors.[9] And federal agents are no different.

Justice Department monitors have no independent statutory authority to enter polling places without consent from state or local election officials. Without local consent, monitors must adhere to laws, restrictions, and limits imposed on third parties. As a result, before each election, the Justice Department would notify and maintain contact with local election officials in the jurisdictions selected for monitoring.[10]

States routinely object to the deployment of the Justice Department's election monitors. In 2024, for example, Texas sued the Justice Department to bar deployment of monitors and prevailed outside of court by securing a favorable agreement with the Department.[11] Other states have opposed the deployment of election monitors, including Hawaii. This underscores a core principle of the U.S. Constitution's Elections Clause—states run elections—and makes clear why providing advance notice to monitored jurisdictions is key.

---

[8] Justice Dep't to Monitor Polls in 27 States for Compliance with Federal Voting Rights Laws, Dep't of Justice (Nov. 1 2024), https://www.justice.gov/archives/opa/pr/justice-department-monitor-polls-27-states-compliance-federal-voting-rights-laws.

[9] *See Feds won't send prosecutors to polls*, NBC News, September 23, 2008, https://www.nbcnews.com/id/wbna26859767.

[10] Justice Department to Monitor Polls in 28 States on Election Day." Department of Justice's Office of Public Affairs. https://www.justice.gov/archives/opa/pr/justice-department-monitor-polls-28-states-election-day; Andrew Garber & Sara Steele, Roles and Rules for the Federal Election Monitor Programs, Brennan Center for Justice (Sept. 15, 2026), https://www.brennancenter.org/our-work/research-reports/roles-and-rules-federal-election-monitor-programs.

[11] Office of the Texas Attorney General. Attorney General Ken Paxton Secures Major Victory Preventing Biden-Harris Administration From Unlawfully Sending DOJ Personnel Inside Texas Election Locations. November 5, 2025. https://www.texasattorneygeneral.gov/news/releases/attorney-general-ken-paxton-secures-major-victory-preventing-biden-harris-administration-unlawfully.

Against this backdrop, Plaintiffs filed a complaint on October 16, 2026, seeking declaratory judgment and injunctive relief to prevent Defendants from threatening and intimidating voters through the unprecedented deployment of over 1,000 Department of Justice personnel that will include criminal prosecutors, law enforcement agents, law enforcement investigators, and law enforcement personnel. Complaint at [1]. In the days that followed, Defendants have continued to engage in intimidating, coercive, and threatening conduct directed at voters, election officials, and election workers, and have escalated their intimidating conduct as we have neared the end of the 2026 general election.

On October 23, two armed federal law enforcement agents reportedly showed up to the Registrar of Voters office in San Benito County, California, presented federal badges, and handed personnel an official demand letter from the DOJ.[12] The letter was titled "Notice of Suspected Likely Aliens on the San Benito County Voter Roll." In the letter, the DOJ listed 33 individuals that they alleged were noncitizens improperly registered to vote and given vote-by-mail ballots. The DOJ demanded that those vote-by-mail ballots be sequestered until the citizenship of those 33 individuals on the list could be confirmed. The letter also requested private details of the individuals listed such as social security numbers, driver's license information, and other information. The DOJ demanded that the San Benito County Registrar of Voters respond within 48 hours. An initial review by San Benito County indicated that some individuals on the DOJ's list were not even registered to vote in the county. This prompted an official statement by Francisco Diaz, San Benito County Registrar of Voters, where he stated, "We will not be intimidated by agents with guns for simply doing our jobs, nor will we be rushed into compromising confidential

---

[12] Francisco Diaz, LinkedIn, https://lnkd.in/p/edPPad8T. Last accessed Nov. 1, 2026.

voter data." In the days leading up to the November 3, 2026 election, officials have contended with armed federal agents at early voting locations, in many places across the country.[13]

On October 28, 2026, acting chief of the Voting Section in the Civil Rights Division, Eric Neff, swore a declaration confirming that DOJ will deploy personnel from *criminal law enforcement agencies* within the Department, including the BOP, ATF, and DEA, to polling locations as election monitors.[14] Mr. Neff's declaration confirms the DOJ's plans to systematically deploy federal law enforcement personnel to the polls. To make matters worse, DOJ has not released a list of the jurisdictions to which they will deploy monitors and instead will not commit to releasing that list.[15] This, too, is in stark contrast to past practice of DOJ monitoring, which provides the public with a list of jurisdictions several days in advance.[16]

Mr. Neff suggests that there is no reason for concern because the Civil Rights Division "is not engaging any sworn law enforcement personnel who are legally authorized to effectuate an arrest to act as monitors in a 'law enforcement agent' capacity."[17] But, being deployed as an election monitor does not suspend a law enforcement agent's authority to effectuate arrests. Federal law enforcement agents never shed their law enforcement powers while on duty, as former Navy lieutenant and Plaintiff Nicholas Little asserts.[18] Regardless, federal law enforcement agents

---

[13] Young, Chris, "*Elections Officials Probe Report of Federal Immigration Agents Outside Key Largo Polling Site*," WLRN (Oct. 27, 2026). https://www.wlrn.org/government-politics/2026-10-27/elections-officials-probe-report-of-federal-immigration-agents-outside-key-largo-polling-site.

[14] Ex. A Declaration of Eric Neff ¶6

[15] *Id.* at ¶11.

[16] e.g. Justice Dep't to Monitor Polls in 27 States for Compliance with Federal Voting Rights Laws, Dep't of Justice (Nov. 1 2024), https://www.justice.gov/archives/opa/pr/justice-department-monitor-polls-27-states-compliance-federal-voting-rights-laws.

[17] *Id.* ¶5

[18] Ex. I Declaration of Nicholas Little ¶8.

always bear law enforcement powers, project command presence, scan crowds, and more, which will have an intimidating effect on Plaintiffs, voters and election workers.

Similarly, Mr. Neff's declaration is careful to point out that personnel from law enforcement agencies will not engage in criminal enforcement "while monitoring," but does not categorically state that law enforcement officers deployed in the monitoring program will not engage in criminal enforcement at polling places. Nothing from Mr. Neff's declaration rules out the possibility of a law enforcement monitor deciding to end their monitoring activities to make an arrest or take any other law enforcement action. Likewise, Mr. Neff and the Civil Rights Division would not have the claimed authority to tell federal agents to leave their guns at home.

Defendants' conduct has harmed and continues to harm Plaintiffs and NAACP members, other voters, and election workers. Voters, including Plaintiffs and NAACP members, are questioning whether they can approach polling places without encountering agents or being subjected to needless investigation and suspicion. NAACP is expending substantial time and resources responding to those concerns, which is interfering with its ability to carry out its core voter mobilization work. The NAACP is expending more time providing voter education on federal law that prohibits federal agents from being at polling sites and it is implementing a late "monitor the monitors" program to help reassure NAACP members and other members of the public that they can vote without interference from federal interference, but that is only in Virgina given the strapped resources.

Plaintiff Little will vote in person on Election Day in Harris County, Texas.[19] As Mr. Little makes clear, he "feel[] intimidated and like [he] will be subjected to criminal scrutiny just for

---

[19] Ex. I Declaration of Nicholas Little ¶3.

showing up to vote."[20] Mr. Little is a voting rights advocate and involved in his community during especially during election season. As part of his work, he has surveyed polling precincts in his county, spoken with constables and local police leadership, and Mr. Little is fearful that federal law enforcement at the polls will "interfere with the election process" if there arises a situation in which there is a "direct conflict in which local officers will have to exert authority over the federal government law enforcement personnel."[21] Mr. Little is familiar with law enforcement, too, and as a former Lieutenant in the United States Navy, he knows that law enforcement officers "are not ever without the authority to effectuate an arrest or carry out law enforcement duties."[22] Polling sites in Harris County have already begun spray painting demarcation lines of the 100-foot barrier behind with DOJ monitors must stand per state law.[23]

Plaintiff Pierre is of Haitian descent and fears that law enforcement agents will be deployed to her polling site in Miami-Dade County, Florida.[24] Given the focus of Defendants' recent deplorable comments about the Haitian Community, threats of criminal legal action against alleged noncitizens voting, the presence of federal law enforcement personnel at polling sites in Miami-Dade Couty is intimidating to her.[25] Additionally, Plaintiff Pierre is concerned about the added threat criminal enforcement personnel serving as DOJ monitors will now create for her get out the vote activities on Election Day, which include visiting multiple precincts across the county and responding to voter complaints.[26]

---

[20] *Id* at ¶12.

[21] *Id.,* ¶ 16.

[22] *Id.* at ¶8.

[23] *Id* at ¶ 15.

[24] Ex. B Declaration of Daniella Pierre

[25] *Id.* at ¶9

[26] *Id.* at ¶11

In Alamance County, North Carolina, Mr. Michael Burns will vote in person on Election Day.[27] This will be Mr. Burns's first time voting since having his voting rights restored. He is concerned, however, that federal law enforcement personnel will interfere with his voting because DOJ monitors will be deployed to polling sites throughout Alamance.[28] While Mr. Burns is a lawfully registered voter and has received written confirmation from state election officials that he is eligible to vote on Election Day this year, the threat of federal agencies with criminal investigatory and arresting authority looms large.

In DeKalb County, Georgia, news that the DOJ monitors confirmed to be coming to its county's precincts on Election Day will include federal law enforcement personnel have voters *and* election officials alike feeling the threat of voter intimidation. Ms. Mary Etta Davis is a registered voter in DeKalb County and will be leaving a medical rehabilitation facility to vote on Election Day and believes that federal law enforcement at her polling site will "be intimidation and an impediment to the right to vote."[29] Mr. Vasudevan Abhiraman, who serves as Vice Chair of the DeKalb County Board of Registration and Elections, is likewise concerned for federal law enforcement to join the DOJ monitors who are set to come to DeKalb on Election Day.[30] DOJ's use of criminal prosectors and an FBI agent in the Arizona primary, and the aggressive behavior of DOJ monitors in Wyoming's primary election caused concern for Mr. Abhiraman. Following DOJ's targeting of election officials in California, Mr. Abhiraman is even more concerned that the presence of law enforcement agency personnel serving as DOJ monitors who are coming to his

---

[27] Ex. D Declaration of Michael Burns, ¶6.

[28] Bonner, Lynn. "*US Justice Department to Send Election Monitors to These NC Counties*," NC Newsline (Oct. 28, 2026) https://ncnewsline.com/2026/10/28/us-justice-department-to-send-election-monitors-to-these-nc-counties/.

[29] Ex. K Declaration of Mmary Etta Davis, ¶5 and 9.

[30] Ex. C Declaration of Vasudevan Abhiraman, ¶1.

county will intimidate voters on Election Day. As Mr. Abhiraman makes clear, too, that risk will also fall on poll workers in DeKalb County.

In Maricopa County, Arizona, Plaintiff Rev. Andre Miller is already feeling the added intimidation since DOJ's announcement that unknown personnel from law enforcement agencies will be part of the DOJ monitoring activities in his county.[31] As the Pastor of a church that serves as a polling precinct, Rev. Miller is responsible for caretaker duties of the building to ensure smooth operations on Election Day and he therefore has a direct role in facilitating the voting process. As he encountered during the primary elections, maintenance needs require his presence in sensitive areas such as the polling area, and he feels anxiety and fear that should such a need arise on Election Day he could be subjected to criminal liability due to the law enforcement personnel from federal agencies monitoring. A poll worker told him on Saturday, October 31st that they will not know if and when DOJ monitors are on premises.

Experienced law enforcement experts are sounding the alarm, too, that DOJ's use of law enforcement personnel at the polls is both a drastic break from institutional norms and is clearly going to generate intimidation and threaten voter turnout at the polls. Mitchell R. Davis, III, President of the National Organization of Black Law Enforcement Executives (NOBLE) maintains that any and all deployments of law enforcement can have an intimidating effect on the electorate.[32] Christopher O'Leary, former FBI Special Agent with more than two decades of service to the United States, states that "Federal law enforcement personnel, regardless of whether they are armed, wearing badges, wearing collar pins, wearing neck lanyards, wearing vests, wearing holsters, or wearing surveillance equipment, have historically not been deployed to

[31] Ex. E Declaration of Rev. Andre Miller, ¶11, 14.

[32] Ex. F Declaration of Mitchell R. Davis III, ¶8.

polling places as a matter of internal Departmental policy, and for good reason. History makes clear that federal law enforcement agents inside polling places -- and all of the criminal law enforcement training that these agents receive and arrest powers that they possess -- would have a chilling effect on the electorate."[33]

## ARGUMENT

A preliminary injunction is appropriate when the moving party shows they are "likely to succeed on the merits, that [they are] likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The standard for a temporary restraining order is substantially the same. *See Sterling Comm. Credit—Michigan, LLC v. Phoenix Indus. I, LLC*, 762 F. Supp. 2d 8, 13 (D.D.C. 2011) (citing to *Hall v. Johnson*, 599 F.Supp.2d 1, 3 n. 2 (D.D.C. 2009)). Plaintiffs satisfy each of the requisite factors.

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

#### a. Defendants' Conduct Violates Section 11(b) of the Voting Rights Act.

Plaintiffs are likely to prevail on their claim that Defendants have violated § 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), as it squarely prohibits the sort of intimidation and election interference created by Defendants' deployment of personnel from federal criminal enforcement agencies. Courts have recognized, "[v]oter intimidation presents an ongoing threat to the participation of minority individuals in the political process[.]" *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 578-79 (D.N.J. 2009), *aff'd* 673 F.3d 192 (3d Cir. 2012), *cert. denied* 133 S. Ct. 1471 (2013).

[33] Ex. G, at ¶9.

**1. 11(b) Prohibits All Forms of Intimidation or Attempted Intimidation in Voting, Based on an Objective Standard**

Section 11(b) of the Voting Rights Act broadly prohibits any person from intimidating, threatening or coercing any other person for voting or attempting to vote or for urging or aiding another person in voting or attempting to vote. *See* 52 U.S.C. § 10307(b). Section 11(b) evinces Congress's clear intent to address a broad scope of conduct: it does not have an intent requirement and applies equally to prohibit any "*attempt* to intimidate, threaten, or coerce," 52 U.S.C. § 10307(b) (emphasis added); it does not require proof that a voter was ultimately unable to cast a ballot due to a defendant's actions; and "vote" and "voting" are defined as encompassing all "action necessary to make a vote effective," 52 U.S.C. § 10310(c). In other words, the statute prohibits any attempts to coerce, intimidate, or threaten regardless of whether they are successful, unsuccessful, or in progress. *See United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965).

To establish a Section 11(b) violation, Plaintiffs must show that Defendants' conduct is objectively intimidating or threatening to voters or those assisting voters. Voter intimidation can take many forms. Under Section 11(b), "threats of economic harm, legal action, dissemination of personal information, and surveillance can qualify." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020); *see also Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary*, 89th Cong. 12 (1965) (statement of Nicholas Katzenbach, Att'y Gen. of the United States) (explaining that Section 11(b) was designed to proscribe violent intimidation as well as more "subtle forms of pressure"); *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (holding that "spurious prosecutions" fell within the scope of Section 11(b)).

A statement or conduct violates Section 11(b) if a reasonable person, considering the full context, would perceive it as threatening injury in a manner that would deter voting or other voting-related activity. *See Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 509

(S.D.N.Y. 2020); *see also Kennedy v. Meta Platforms, Inc.*, No. 3:24-CV-02869-WHO, 2024 WL 4031486, at *6 (N.D. Cal. Sept. 3, 2024) (11(b)'s language is "is broad and protects both the right to vote and the right to urge others to vote"); *Kennedy v. Meta Platforms, Inc.*, No. 3:24-cv-02869, 2024 WL 4031486, at *6 (N.D. Cal. Sept. 3, 2024) (similar). Likewise, courts have found that "[i]mportantly, any definition of intimidation must account for rights established in the Constitution. In *Wohl*, the court balanced these interests and held that "intimidation includes messages that a reasonable recipient, familiar with the context of the message, would interpret as a threat of injury—whether physical or nonviolent—intended to deter individuals from exercising their voting rights." 512 F. Supp. 3d at 509. … So long as the allegedly threatening or intimidating conduct puts individuals "in fear of harassment and interference with their right to vote," the conduct is sufficient to support a Section 11(b) claim. *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (citing *Damon v. Hukowicz*, 964 F. Supp. 2d 120, 149 (D. Mass. 2013)).

Because intimidation, threats, and coercion are defined by their effect on reasonable voters, courts evaluate the challenged conduct in context and under the totality of the circumstances. Challenged acts "cannot be viewed in isolation" but must be considered as a whole and "against the background of contemporaneous events." *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967). Accordingly, Section 11(b) reaches conduct that would reasonably intimidate, threaten, or coerce voter participation even when it is not directed at specifically identified voters. *See, e.g.*, *Ariz. All. for Retired Americans v. Clean Elections USA*, No. 22 Civ. 1823, 2022 WL 17088041, at 2.

**2. Defendants' Conduct Is at the Core of What 11(b) Was Intended to Prohibit**

Defendant's conduct in this case falls squarely within the intimidation prohibited by this statute. Indeed, it harkens to the very type of overt intimidation that Section 11(b) was enacted to address. *See, e.g., Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 353 (E.D. La. 1965) (addressing not just "physical violence" but also other more indirect "varieties of intimidation");[34] *see also McLeod*, 385 F.2d 734, 740-41 (5th Cir. 1967) (addressing "baseless arrests and prosecutions"). Taken together, the actions of Defendants create an unmistakable atmosphere of intimidation that justifies extraordinary relief. The deployment of law enforcement to polling sites is reminiscent of the century preceding the enactment of the Voting Rights Act, during which time law enforcement personnel arrested Black Americans attempting to exercise their right to vote.

Indeed, over 60 years later, Ms. Brenda Muhammad of DeKalb County, Georgia should not be "in a situation where [she] must develop a plan to ensure that [she] can freely cast [her] ballot" because she "feel[s] intimidated" by "reports that indicate that DOJ monitors will include law enforcement personnel."[35]

### 3. Defendants' Statements Targeting the Voting Process Are Intimidating

Federal law enforcement attorneys, investigators, and agents have engaged in intimidating action directed at local and state voting officials by threatening investigations based on debunked allegations of voter fraud. For example, Defendant Dhillon stated on August 20, 2026 that monitors

---

[34] *Katzenbach* and certain other cases cited herein were brought under the Civil Rights Act of 1957, 52 U.S.C. § 10101(b) ("Section 131(b)")), which is VRA § 11(b)'s predecessor statute. Like VRA § 11(b), Section 131(b) prohibits "intimidat[ion]," "threat[s]," and "coerc[ion]" in connection with voting. 52 U.S.C. § 10101(b). VRA § 11(b) was enacted to expand Section 131(b). See H.R. Rep. No. 89-439, at 30 (1965). Thus, VRA § 11(b) is interpreted *in pari materia* with Section 131(b), but more broadly.

[35] Ex. J Declaration of Brenda Muhammad ¶6-8.

would be deployed to locations "where there may be voter fraud issues that we've seen."[36] And on July 7, 2026, while publicly discussing her plans for November, Defendant Dhillon suggested that DOJ "election monitors" would ensure that no citizen's vote would be "canceled out" by someone who "should not be voting."[37]

In an October 2026 statement, a [38] spokesperson said all "department attorneys, including prosecutors, will serve as election monitors."[39] On October 29, just days before Election Day, defendants sent letters to election officials in all 50 states threatening potential prosecution and "up to a year in prison and a $1,000 fine" for failure to preserve election records.[40]

Dozens of US Attorney offices have issued press releases asserting they will seek out and criminally prosecute alleged "election fraud." In the Southern District of Texas, where Harris County is located, U.S. Attorney Aaron Reitz threatened to "hunt down" voters and election officials who violate the law. Defendants' publicized plans to deploy federal law enforcement officers, in combination with their dubious, eleventh-hour litigation efforts and their public statements threatening criminal investigation and prosecution have, together, had an intimidating effect on both voters and poll workers. Plaintiffs seek relief to block the deployment of federal law enforcement officers as poll workers who would clearly have an intimidating effect on voters and

---

[36] Bloomberg Talks: Harmeet Dhillon (Aug. 17, 2026), https://www.bloomberg.com/news/audio/2026-08-17/bloomberg-talks-harmeet-dhillon-podcast; RCPod, Harmeet Dhillon Joins to Talk Election Integrity (Aug. 20, 2026).

[37] Video posted by Harmeet Dhillon (@AAGDhillon), X, We @TheJusticeDept are proud to safeguard every American's right to vote — and we will continue routine, nonpartisan election monitoring that's been standard under both Republican & Democrat administrations for decades. Stay tuned for more! (July 7, 2026), https://x.com/AAGDhillon/status/2074616926941114411.

[39] Jacob Knutson, "*DOJ dispatched criminal prosecutors, FBI agent to monitor Arizona's primary, documents reveal,*" Democracy Docket (Oct. 6, 2026), https://www.democracydocket.com/news-alerts/doj-dispatched-criminalprosecutors-fbi-agent-to-monitor-arizonas-primary-documents-reveal/.

[40] Huseman, Jessica, "*DOJ Again Warns Election Officials of Potential Criminal Prosecution, Days Before Midterm Elections*," Vote Beat (Oct. 30, 2026). https://www.votebeat.org/national/2026/10/30/doj-election-officials-criminal-prosecution-letters-2026-midterms/

poll workers during the November 3rd general election and any election-related activity that happened following Election Day.

**4. Defendants' Plans to Deploy Federal Law Enforcement Personnel to Monitoring Polls Is Intimidating**

The presence, or threatened presence, of personnel from criminal enforcement agencies at polling places presents Section 11(b) concerns and is likely to deter voters from exercising the franchise. *See Council on American-Islamic Relations-Minnesota v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379 (D. Minn. 2020); *United States v. Clark*, 249 F. Supp. 720, 725 (S.D. Ala. 1965).

Courts have granted relief not only when personnel from criminal enforcement agencies were physically present, but also when public threats to deploy such personnel deterred voters from appearing at the polls. *Council on American-Islamic Relations Minnesota*, 497 F. Supp. 3d at 380 (preliminarily enjoining the carrying out of contracted services to provide armed personnel at poll sites). The same principle underlies decisions finding intimidation where voters were forced to navigate the presence of law enforcement or other intimidating obstacles created by them when attempting to vote. *See United States v. Clark*, 249 F. Supp. 720, 725 (S.D. Ala. 1965) (enjoining law enforcement stationed around courthouse where voter registration occurred); *see also ACLU of Michigan v. Does 1-6*, 755 F. Supp. 3d 1003, 1006 (E.D. Mich. 2024) (granting temporary restraining order against physical intimidation and filming); *Rhodes v. Siver*, 2021 WL 1565137, at *4 (E.D. Mich. Feb. 1, 2021) (denying motion to dismiss voter-intimidation claim).

States and local governments administer virtually every aspect of the voting process, from voter registration and polling place operations to ballot counting and certification. Voters therefore reasonably expect to encounter state and local election officials, not federal law enforcement officers, when exercising their right to vote. That expectation is particularly warranted with respect

to federal law enforcement agents, investigators, and other personnel or those conscripted with such responsibility, whose statutory responsibilities concern the enforcement of federal criminal laws and not the administration of elections.

The DOJ's departure from its past practice of prohibiting law enforcement officers from being present at the polls renders voting intimidating for Plaintiffs. Whereas the prior mission of the DOJ was to protect the right to vote and ensure through its monitors that the right to vote was protected, public statements by the DOJ make clear the purpose is to scrutinize voters and the process. Defendants have made changes to their enforcement efforts impossible to ignore, which too is a form of intimidation. Through public statements, press releases, videos, election-related investigations, and highly visible enforcement operations and threats to elections officials, Defendants have repeatedly broadcast the message that voting-related activity may trigger government scrutiny. As a result, the chilling effect reaches far beyond the individuals directly contacted by agents and instead permeates across entire communities of potential voters, volunteers, election workers, and civic engagement organizations.

The intimidation resulting from these incidents is magnified by the broader enforcement context. The federal government has simultaneously undertaken a highly-publicized and expanded campaign of unfounded election fraud enforcement. Defendants also have threatened state and local officials, and election workers, with criminal investigation and prosecution for carrying out their duties to facilitate the election process. Courts have recognized that threats of arrest, and prosecution, and deportation are among the paradigmatic forms of voter intimidation because they communicate the prospect of severe legal consequences flowing from electoral participation. *National Coalition on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 481 (S.D.N.Y. 2020) ("Communicating the prospect of adverse legal consequences, including arrest or

prosecution, may rise to the level of unlawful threat or intimidation."); *Kennedy v. Meta Platforms, Inc.*, 2024 WL 4031486, at *7 (N.D. Cal. Sept. 3, 2024) (recognizing that threats of deportation against immigrants and their family members can constitute intimidation under Section 11(b)).

Taken together, the deployment of federal law enforcement agents, investigators, and personnel at voting sites, the broader backdrop of intensified law enforcement efforts and threats to elections officials, and the dramatic surge in voting-related field investigations create exactly the type of objective and pervasive intimidation that Section 11(b) prohibits and should be enjoined here. *See McLeod*, 385 F.2d at 740.

## II. Plaintiffs Are Already Suffering and Will Continue to Suffer Irreparable Harm in the Absence of a Preliminary Injunction.

There can be no doubt that Plaintiffs are suffering, and will continue to suffer, irreparable harm absent the issuance of immediate injunctive relief.

DOJ has publicly confirmed that employees from the BOP, ATF, and DEA will serve as poll monitors on election day.[41] This threat is not illusory. NAACP members live and vote in the communities where DOJ has traditionally monitored because of credible threats to their voting rights. NAACP members and volunteers are aware that, for the first time, DOJ monitors will include federal law enforcement agencies.[42] As such, members have reported the negative effects that the presence of BOP, ATF, and DEA agents are having on voters, volunteers, and election officials. *Id.* (Sterling Decl.). NAACP members and other voters fear that they or someone in their family, neighborhood, or community will be affected by this criminal enforcement personnel presence at the polls. *Id.* (Sterling Decl.). The credible threat of federal agents' presence at the

---

[41] Ex. A, at ¶6.

[42] Ex. H Declaration of Tyler Sterling, ¶ 16.

polls has led Plaintiff NAACP to divert resources from core election-support activities to address the reality of voter intimidation by law enforcement officials serving as poll monitors.

Likewise, Plaintiff NAACP has received enough concerned outreach from members regarding federal law enforcement at the polls, and particularly concern over potentially armed agents, that NAACP has included training on the clarity of statutes protecting against this type of conduct such as 18 U.S.C. § 592. This federal law prohibits any "person in the civil, military, or naval service of the United States" to "order[], bring[], keep[], or ha[ve] under his authority or control any troops or armed men at any place where a general or special election is held, unless such force be necessary to repel armed enemies of the United States." 18 U.S.C. § 592. The NAACP's voter education work makes clear that the plain language of this federal statute bars Defendants from sending federal agents to places where elections will be held on November 3, 2026.

Defendants' actions force NAACP volunteers and voters, as well as the individual Plaintiffs, to make precisely the "'Hobson's choice'" between casting a ballot in the 2026 elections or facing intimidation and the possibility of imminent law enforcement investigation that other courts have found to constitute irreparable harm. *Service Employees Int'l Union, AFL-CIO, et al. v. U.S. Dep't of Justice*, No. 3:26-cv-12800 (N.D. Cal. Oct. 30, 2026) (granting TRO on VRA Section 11(b) claim); *Cal. Nurses Assoc. v. Mullin*, No. 26-cv-10680, 2026 WL 3166149, at *9 (N.D. Cal. Oct. 21, 2026) (finding that in "voter intimidation cases, district courts recognize that plaintiffs suffer irreparable harm if the "right to vote freely is abridged" because of "intimidation, threatening conduct, or coercion."), *denying stay*, 2026 WL 3268397 (9th Cir. 2026); *see also New York v. Admin. for Children & Families*, 833 F.Supp.3d 361, 401 (S.D.N.Y. Mar.10, 2026) (quoting City of Chicago v. Sessions, 264 F.Supp.3d 933, 950 (N.D. Ill. 2017)); *see also Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) (holding that a "Hobson's choice" in the face of imminent

enforcement action can constitute irreparable injury). Both the NAACP as an organization and its members face irreparable harm. *See Martinez-Andino v. U.S. Dep't of Homeland Security*, No. 26-1208, 2026 WL 2140430at *17 (D.D.C. July 25, 2026) ("Plaintiff need not show 'certain' irreparable harm, but [ ] must show a irreparable harm which is not 'too speculative' and is 'actual and not theoretical.'")

When it comes to federal law enforcement agency at the polling locations, the individual plaintiffs and NAACP members are clear that their fear and the intimidation cast on them is actual. For example, Mr. Burns states that this is his first time voting in over two years and his first time voting after having his voting rights restored, and that he is "deeply concerned with the potential for federal law enforcement personnel to be present at [his] polling location" because of "the public statements that DOJ leadership has made in regards to hunting for people illegally voting."[43] And Mr. Burns has a valid reason to expect to encounter these DOJ monitors because he lives in Alamance County, NC, which has only 40 voting precincts, where DOJ has been confirmed to be heading for monitoring on Election Day by the North Carolina Board of Elections, and where local law enforcement pepper sprayed dozens of Black people on their way to the polls in 2020.[44]

Safeguarding the fundamental right to vote also encompasses preventing interference with voting-related conduct. Section 11(b) expressly protects both voting and voting-related conduct: its reach is deliberately "extensive" to realize "the Fifteenth Amendment's promise of unencumbered access to the vote." *Wohl*, 498 F. Supp. 3d at 476. Protected voting-related conduct includes voter outreach and engagement, education, and registration, among other activities. *Id.*; *Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772, at *8 (M.D.N.C. Jun. 2, 2021);

[43] Ex. D at ¶11.

[44] *Id.* at ¶7 and 8; *Allen v. City of Graham*, 1:20-CV-997, 2021 WL 2223772 (M.D.N.C. June 2, 2021).

*California Nurses Association v. Mullin*, No. 26-cv-10680-AMO, 2026 WL 3166149, at *9 (N.D. Cal. Oct. 21, 2026). This broad scope reflects the reality that voter intimidation often operates indirectly but has irreversible consequences: "if some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact." *Wohl*, 498 F. Supp. 3d at 474 (internal quotation marks and citation omitted).

It is precisely this harm that Mr. Abhiraman cites as his concern with having federal law enforcement personnel at the polls. "[T]he presence of law enforcement agency personnel at polling places risks intimidating voters *and election workers*, whether or not they are armed or display insignia."[45] The threat of criminal prosecution against poll workers interferes with the county's ability to effectuate the voters' ballot.

Since DOJ's announcement that it planned to station federal agents across the country in early October, the NAACP has expended substantial time and resources responding to its members' concerns at the expense of its core voter mobilization work. Over the past four weeks the NAACP has diverted resources towards developing know your rights materials, holding branch and conference meetings to address member fears, and responding to individual member inquiries around voting and rights at the polls in response to Defendants' planned mobilization. Moreover, many NAACP members have expressed a heightened level of fear in connection with their volunteer efforts to assist voters.

The cumulative impact of these shifts has been a significant reduction in the NAACP's ability to conduct its critical get-out-the vote and voter protection efforts.[46] The NAACP operates

---

[45] Ex. C ¶4 (emphasis added).

[46] *Id* at ¶ 20.

one of the largest voter engagement programs in the country and, because of Defendants' election interference and intimidation of voters at the polls, countless voters who rely on the NAACP's engagement to exercise their right to vote will have their vote suppressed. This harm is exactly the type envisioned by the broad scope of section 11(b), and it is irreversible. Moreover, absent injunctive relief, some NAACP members and other voters like Plaintiffs will be chilled from exercising the franchise and voting in the 2026 elections because they reasonably fear that ATF, BOP and DEA officials will be present as "monitors" at the polls. The impediment to and/or loss of the right to vote is irreversible and constitutes irreparable harm.

## III. The Balance of the Equities and Public Interest Favor an Injunction Here, Especially Where the Fundamental Right to Vote is at Stake.

When the government is a party, courts merge analysis of the harm to the opposing party and the weighing of the public interest, because the government cannot have a legitimate interest that is not in the public interest. *See Nken v. Holder*, 556 U.S. at 435 (2009); *Hanson v. District of Columbia*, 120 F.4th 223, 246 (D.C. Cir. 2024).

The equities and public interest also compel relief because the injunction would protect voting rights, preserve public confidence in election administration, and prevent intimidation of voters and interference with the voting process. Plaintiffs' ongoing injuries are substantial, and the Defendants do not suffer any injury if they are enjoined from unlawful conduct. Plaintiffs' requested relief supports the public interest because of the foundational nature of voting to all other rights and laws. *See Wesberry*, 376 U.S. at 17 ("No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined.").

### IV. The Public Interest Favors Ensuring Eligible Voters Are Not Intimidated or Prevented from Casting Their Ballots by the Active Deployment of Federal Law Enforcement Agents, Investigators, and Personnel Near Polling Places or by the Interference of Such Federal Officials with the Conduct of the Election.

The public interest can only favor protecting the right of Plaintiff NAACP's impacted members to vote, the right of and private Plaintiff voters, and the interests of the NAACP in aiding voters. For well over a century, the Supreme Court has viewed the right to vote as a "fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson v. Freeman*, 504 U.S. 191, 199 (1992), and the right to cast an effective vote has long been regarded as among the Constitution most precious protections. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968).

Consistent with these foundational principles, the public has a "strong interest in exercising the fundamental political right to vote" and that the public interest "favors permitting as many qualified voters to vote as possible." *Newby*, 838 F.3d at 1, 12 (quoting *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006), and *Obama for Am. v. Husted*, 697 F.3d 423, 437 (6th Cir. 2012)). That interest extends beyond the act of casting a ballot. The public has a strong interest in voter registration, voter education, voter outreach, and other voting-related activities proceeding free from intimidation, threats, and coercion. These are all core activities that compose Plaintiff NAACP's mission.

The requested injunction directly advances those interests. It would ensure that Plaintiffs can vote without fear of federal law enforcement intervention at or near polling locations, and that Plaintiff NAACP can administer their get out the vote activities without fear of intimidation. It would reduce the deterrent effect of Defendants' threats and permit voters, volunteers, organizers, and community members to participate in voting-related activities without fear of questioning,

investigation, detention, or physical confrontation. *See Council on Am.-Islamic Rels.-Minnesota*, 497 F. Supp. 3d at 379 (noting that the defendants' threats of sending armed paramilitary personnel to polls was dissuading some residents from voting in person). Plaintiff NAACP will avoid harms to their core activities because they will not be hindered from advancing work to encourage or facilitate voting, given their members' concerns and fears regarding the potential for interaction with federal law enforcement will be mitigated. There can be no dispute that limiting intimidation in the voting process is in the public interest.

**a. An Injunction Will Not Prevent Defendants from Carrying out Legitimate Law Enforcement Activities.**

Defendants, by contrast, have no legitimate interests that weigh against an injunction. Where the public interest and the government interest have merged, as here, the two should be considered together. And Defendants "cannot suffer harm from an injunction that merely ends an unlawful practice." *Open Communities Alliance v. Carson*, 286 F.Supp.3d 148, 179 (D.D.C. 2017). That is all that Plaintiffs ask here.

Defendants have attempted to justify their unlawful activities by invoking unfounded theories of voting fraud. But the overwhelming evidence demonstrates that voting fraud is exceedingly rare and not a systemic problem.[47] Defendants cannot justify the type of generalized federal law enforcement deployment in the vicinity of polling places as a legitimate public safety need. In short, the predictable effect of such deployments is not to uncover unlawful voting or fraud, but to intimidate lawful voters' participation in the electoral process. This cannot outweigh the public's, and local and state officials', substantial interest in ensuring that elections are

---

[47]Kamarck, Elaine, "*Why Do So Few Noncitizens Try to Vote?*" Brookings (July 23, 2026) https://www.brookings.edu/articles/why-do-so-few-noncitizens-try-to-vote/; Reichlin-Melnick, Aaron, "*Unpacking Myths About Noncitizen Voting—How Heritage Foundation's Own Data Still Proves It's Not the Problem It's Made Out to Be*," American Immigration Council (Aug. 13, 2026) https://www.americanimmigrationcouncil.org/blog/myths-about-noncitizen-voting-heritage-foundation-data/

conducted openly and fairly, free from interference by federal law enforcement acting in contravention of their statutory and constitutional obligations. *See California Nurses Ass'n*, 2026 WL 3166149, at *9-10.

DOJ has conducted limited poll monitoring in the past, and as an agency with more than 100,000 employees, they have done so without deploying law enforcement agents, investigators or personnel. Indeed, DOJ has tens of thousands of employees outside of its federal law enforcement components, so Defendants would not be prejudiced in the least if they were restrained from deploying such law enforcement agents, officers, and personnel inside the polls.

Finally, "there is a substantial public interest in having governmental agencies abide by the federal laws that govern their existence and operations." *Newby*, 838 F.3d at 12 (citation modified). Courts have recognized that enforcement actions undertaken in sensitive civic and legal settings can stifle participation in civic life. *See Pablo Sequen v. Albarran*, 814 F. Supp. 3d 1005, 1041 (N.D. Cal. 2025). Even in situations where enforcement does not contravene such strong interests, where operations are unlawful, the government cannot rely on an interest in conducting "routine field operations" to justify its actions. *See Venegas v. Homan*, 25-cv-00397, 2026 WL 2822069 at *22-23 (S.D. Ala. Sept. 21, 2026); *see also Alabama Association of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021). Those principles must apply with even greater force at polling places, where election administration is entrusted to the states and the public has an interest of the highest order in protecting access to the franchise.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction should be granted, pursuant to the Proposed Order attached hereto.

DATED: November 1, 2026 Respectfully submitted,

*/s/ Max L. Meyers*
Kristen Clarke*
Max L. Meyers*
Anthony Ashton
NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE
4805 Mt. Hope Drive
Baltimore, MD 20215
Phone: 480-580-5777
kclarke@naacpnet.org
mmeyers@naacpnet.org
aashton@naacpnet.org

John Powers
Hani Mirza*
Peter Ketcham-Colwill*
ADVANCEMENT PROJECT
1220 L Street NW, Suite 850
Washington, DC 20005
Phone: 202-728-9557
jpowers@advancementproject.org
hmirza@advancementproject.org
pketchamcolwill@advancementproject.org

Kathryn Sadavasian**
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.

40 Rector Street, 5th Floor
New York, NY 10006
(212) 965-2200
ksadavasian@naacpldf.org

Donya Khadem**
Chloe Miller**
NAACP LEGAL DEFENSE & EDUCATIONAL FUND, INC.
700 14th St. N.W.
Ste. 600
Washington, DC 20005
Dkhadem@naacpldf.org
Cmiller@naacpldf.org

**Admitted Pro Hac Vice*
** *Pro Hac Vice* motion forthcoming

**CERTIFICATE OF SERVICE**

I hereby certify that that on November 1, 2026, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system. I also certify that I sent the foregoing via email to the United States Attorney's Office for the District of Columbia using their e-service email address USADC.ServiceCivil@usdoj.gov. I further certify that Plaintiffs have complied with the rules of service under LCvR 65.1 based on the attached declaration by undersigned counsel.

______*/s/Max Meyers*_______