**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| NAACP, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>TODD BLANCHE, in his official capacity as Attorney General of the U.S. Department of Justice, et al.,<br><br>Defendants. | Civil Action No. 1:26-cv-03626-RBW |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

## I. INTRODUCTION

The Civil Rights Division of the Department of Justice has long conducted monitoring of polling places on election day using federal observers, and as well as monitoring using Department employees and staff, to help assess compliance with the federal voting rights laws around the country. Plaintiffs' eleventh-hour attempt to enjoin these important efforts should be rejected. Plaintiffs cannot establish a likelihood of success on the merits of their Voting Rights Act claim, their speculative claims of injury fall well short of the demanding standard for irreparable harm required for the extraordinary injunction they seek, and the balance of equities tips decisively in favor of the government. The Court should deny Plaintiffs' motion.

## II. BACKGROUND

### A. Longstanding History of DOJ Poll Monitoring Program

The Department of Justice Voting Section is conducting its election monitoring efforts for the upcoming 2026 midterm election in a similar manner and for similar purposes as in past election cycles going back decades. *See* Declaration of Eric Neff ¶ 2. The primary purpose of election monitoring is to ensure compliance with federal civil rights statutes the Voting Section enforces. *See* 28 C.F.R. §§ 0.50-51. Neff Decl. ¶ 3. These statutes include, *inter alia*, the Voting Rights Act (52 U.S.C. §§ 10301-10314, 10501-10508, and 10701-10702), the National Voter Registration Act (52 U.S.C. § 20501 *et seq.)*, and the Civil Rights Act (52 U.S.C.§§ 10101, 20701 *et seq.*). *Id.*

In accordance with past practice, the Civil Rights Division ("CRT") provides comprehensive training of all monitors on federal and local laws, as well as best practices during monitoring. Neff Decl. ¶ 4-7. This training includes a prohibition on the carrying of firearms, as well as the wearing of identifying clothing or accessories. *Id.*

Further, consistent with past practice, CRT has sought volunteers from within the Department of Justice to serve as monitors under CRT supervision. Neff Decl. ¶ 8. CRT's policy is to avoid engaging any sworn law enforcement personnel who are legally authorized to effectuate an arrest to act as monitors in a "law enforcement capacity." *Id.* ¶ 10. CRT is taking appropriate steps to ensure that the volunteers it engages from the Department's law enforcement components are not law enforcement officers. *Id.* Additionally, there will be no Federal Bureau of Investigation or U.S. Immigration and Customs Enforcement employees, much less agents, serving as monitors. *Id.* ¶ 9.

Employees from the Federal Bureau of Prisons; the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the Drug Enforcement Administration will serve as monitors. Neff Decl. ¶ 9. As with all monitors, those employees are prohibited from having any firearms with them, and they are prohibited from undertaking any action while monitoring other than normal CRT monitoring conduct such observing the polling place and taking notes on their observations. *Id.* Thus, while monitoring, the monitors will not be acting as "law enforcement personnel," a "law enforcement officer," or a "law enforcement agent" as commonly understood. *Id.*

Monitors receive appropriate training to ensure they adhere to these important limitations. The training—conducted in two sessions—instructs monitors in a manner consistent with past practice. Neff Decl. ¶ 11. Monitors are instructed that their primary role is largely limited to observing, taking notes, and interviewing willing voters outside the polling place about their voting experience, where appropriate. *Id.* Moreover, the monitors have been instructed and trained to:

- not intrude or interfere in any way with either anyone voting or the election officials at the polling place;
- follow all rules of the state and jurisdiction to which the monitor is assigned;
- dress in business casual clothing;

- not have any insignia from their federal employment visible on their clothing;
- not talk with any voter inside the polling place;
- only talk to voters outside the polling place *after* the voter has cast his or her ballot; and
- introduce themselves to the election officials upon arrival at the polling place and to have federal employment credentials with them to verify that they are federal employees if asked.

Neff Decl. ¶ 12.

### B. Procedural History

Plaintiffs, who are parties in another lawsuit challenging alleged placement of armed federal agents at polling places (*NAACP v. DHS*, No. 1:26-cv-03263, D.D.C.), filed the instant TRO motion on Sunday night at midnight. *See* ECF No. 14-3, ¶ 7. The motion includes several declarations. Despite the time they took to draft their 27-page brief and a dozen supporting declarations, Plaintiffs could not be bothered to send notice of the motion (or a copy of it) to any U.S. government attorneys who had appeared in their other lawsuit. Nor did Plaintiffs copy the DDC Civil chief (Mr. Pete Pfaffenroth), or the directors of the Federal Programs Branch (Alex Haas and Diane Kelleher). They were content only with serving the anonymous email address for the DC USAO, so Plaintiffs left it at that. The Court's order for a filing at 10:30 AM today and a hearing at 1:30 PM today followed shortly after Plaintiffs' midnight filing. Emergency motions are not exempt from efforts to notify counsel appropriately, and this Court should make it clear to Plaintiffs that their actions are deficient in this regard.

Plaintiffs' Motion contends that they are likely to succeed on the merits of their claim under Section 11(b) of the Voting Rights Act. *See* Pls.' Mot. at 4 n.5, 13-24. Section 11(b) of the Voting Rights Act of 1965 provides in relevant part that "[n]o person, whether acting under color of law

or otherwise, shall . . . intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b). The Act confers authority on the Attorney General to seek injunctions against any act prohibited by Section 11. *Id.* § 10308.

## III. LEGAL STANDARD

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)), *cert. denied*, 145 S. Ct. 2778 (2025); *see also, e.g., D.A.M. v. Barr*, 474 F. Supp. 3d 45, 55 (D.D.C. 2020) ("A TRO is an extraordinary remedy and should be granted sparingly.") (citation omitted). A plaintiff seeking a preliminary injunction bears the burden of establishing "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Doe v. Blanche*, 172 F.4th 901, 911 (D.C. Cir. 2026) (quoting *Winter*, 555 U.S. at 20). "The same standard applies to both temporary restraining orders and to preliminary injunctions." *D.A.M.*, 474 F. Supp. 3d at 55-56 (citation omitted).

*Winter* strongly indicates that all four preliminary injunction factors must be independently shown to obtain preliminary relief. *See* 555 U.S. at 20. Nonetheless, the D.C. Circuit has not yet expressly repudiated its preexisting "sliding scale" approach to the preliminary injunction factors, under which "a strong showing on one factor could make up for a weaker showing on another" in certain circumstances. *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1235–36 (D.C. Cir. 2025) (explaining it is "questionable that the sliding scale approach remains good law" after *Winter*). Even under the sliding scale approach, however, a failure to show irreparable harm is fatal to a request for preliminary relief. *Id.* at 1236. At most, preliminary relief may issue under

this approach where a plaintiff "raise[s] a serious legal question on the merits" and "the other three factors strongly favor issuing an injunction." *Glob. Health Council v. Trump*, 153 F.4th 1, 12 (D.C. Cir. 2025) (quoting *Aamer v. Obama*, 742 F.3d 1023, 1043 (D.C. Cir. 2014)).

In any event, whether the Court applies the questionable sliding scale approach or not, Plaintiffs bear the burden of persuasion on all four factors. *See N.Y. Times Co. v. Def. Health Agency*, 2021 WL 1614817 at * 3 n.5 (D.D.C. Apr. 15, 2021); *Urb. Sustainability Dirs. Network v. Dep't of Agric.*, 2025 WL 2374528 at *11 (D.D.C. Aug. 14, 2025).

## IV. ARGUMENT

### A. Plaintiffs Lack Standing

#### 1. Plaintiffs lack an injury-in-fact

"[W]ithout jurisdiction, a court lacks power to consider a case at all." *Schindler Elevator Corp. v. Washington Metro. Area Transit Auth.*, 514 F. Supp. 3d 197, 202 (D.D.C. 2020), *aff'd,* 16 F.4th 294 (D.C. Cir. 2021) (quoting *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 510 (D.C. Cir. 2018)). "To that end, federal courts are empowered—and indeed, have an obligation—to undertake an independent investigation to assure itself of its own subject-matter jurisdiction." *Id.* at 202. The Court must presume it does not have jurisdiction. *Logan*, 357 F. Supp. 2d at 152. "And if it is determined that the court does not have subject-matter jurisdiction, it cannot afford plaintiffs any relief—injunctive or otherwise." *Schindler Elevator Corp.*, 514 F. Supp. 3d at 202 (denying motion for preliminary injunction).

To invoke a federal court's jurisdiction, a plaintiff must have Article III standing. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 (1998). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would

likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

On the face of Plaintiffs' Complaint, Plaintiffs allege, in part, that "Defendants' statements create the specter of federal criminal prosecutors and other law enforcement monitoring and confronting voters at polling places, which is instilling fear in and having a chilling effect on Plaintiff Little, Pierre, Miller, other NAACP members, and the public at large." Compl. ¶ 13. However, Plaintiffs cannot demonstrate to the Court – based on news clippings and federal officials' press statements, updates to the DOJ website, and DHS investigations – that (1) Plaintiffs and their members have suffered or will suffer a "concrete, particularized, and actual or imminent" injury; (2) said injury was likely caused by the Defendants, and (3) the Court can provide Plaintiffs and their members any judicial relief. *TransUnion LLC*, 592 U.S. at 423.

At most, Plaintiffs detail voluntary responses to their speculative fears that armed federal agents will be deployed to polling locations in the 2026 General Election. The Supreme Court has "repeatedly reiterated that 'threatened injury must be certainly impending to constitute injury in fact,' and that 'allegations of possible future injury' are not sufficient." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *see also FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 381 (2024) ("[T]he injury must be actual or imminent, not speculative—meaning that the injury must have already occurred or be likely to occur soon").

None of the Plaintiffs have demonstrated a certainly impending injury-in-fact. Plaintiffs do not point to any policy or statement that the Federal Government intends to deploy armed federal agents to polling locations. To the contrary, Plaintiffs themselves point out that the DOJ's Acting Chief of the Voting Section within the Civil Rights Division ("CRT") has issued a sworn declaration that "[t]here will be no Federal Bureau of Investigation or U.S. Immigration and

Customs Enforcement employees, much less agents, serving as monitors." *See* First Neff Decl. ¶ 6, ECF No. 14-5. Indeed, aside from the "one U.S. Customs and Border Protection (CBP) employee detailed to the [DOJ], CRT is not aware of any other Department of Homeland Security (DHS) employees participating in CRT's monitoring of the 2026 general election." *Id.* Some of these monitors include "[e]mployees from the Federal Bureau of Prisons; the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the Drug Enforcement Administration[.]" *Id.*

But as Neff explained, these monitors "will not be acting as 'law enforcement personnel.'" *Id.* They "are prohibited from having any firearms with them" and "from undertaking any action while monitoring other than normal CRT monitoring conduct." *Id.* Thus, like all other monitors, they will be "observing the polling place and taking notes on their observations." *Id.*

Despite being aware of these sworn assurances, *see* Pierre Decl. ¶ 7 ("I have read Eric Neff's declaration dated October 28, 2026[.]"); Miller Decl. ¶ 9 (same); Sterling Decl. ¶ 12 (same), Plaintiffs or their members state that they are "genuinely fearful of facing the law enforcement agents that Mr. Neff confirmed will be deployed by DOJ on Election Day to voting locations," Pierre Decl. ¶ 9; *see also* Burns Decl. ¶ 11 ("deeply concerned with the potential for federal law enforcement personnel to be present at [his] polling location"); Miller Decl. ¶ 11 ("extremely concerned that DOJ monitors will include personnel from criminal agencies"); Little Decl. ¶ 12 ("feel[s] intimidated and like [he] will be subjected to criminal scrutiny just for showing up to vote").

None of these speculative fears establish a concrete, imminent injury traceable to the challenged conduct. Importantly, "psychic satisfaction is not an acceptable Article III remedy because it does not redress a cognizable Article III injury." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998). What matters "is the *reality* of the threat of [future] injury," not a

plaintiff's "subjective apprehensions." *City of Los Angeles v. Lyons*, 461 U.S. 95, 107 n.8 (1983). Thus, the "emotional consequences" of government action "simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.*

Plaintiffs attempt to re-frame Neff's first declaration, stating that it "does not categorically state that law enforcement officers deployed in the monitoring program will not engage in criminal enforcement at polling places." Pls. Mot. at 9. But the declaration states that volunteers are "not sworn law enforcement personnel." First Neff Decl. ¶ 9. And his most recent declaration explains that "CRT's policy is to avoid engaging any sworn law enforcement personnel who are legally authorized to effectuate an arrest to act as monitors in a 'law enforcement capacity.' CRT is taking appropriate steps to ensure that the volunteers it engages from the Department's law enforcement components are not law enforcement officers." Second Neff Decl. ¶ 10, Ex. C. In sum, Plaintiffs' fears are nothing short of speculative, and Plaintiffs' certainly have not shown an imminent and impending injury.

Plaintiff NAACP also appears to assert associational standing based on these same members' fear. *See* Pierre Decl. ¶ 4; Miller Decl. ¶ 3; Burns Decl. ¶ 4; Sterling Decl. ¶ 3; Davis Decl. ¶ 6.

"An organization can assert associational standing on behalf of its members if: '(1) at least one of their members has standing to sue in her or his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires the participation of an individual member in the lawsuit.'" *Elec. Privacy Info. Ctr. v. U.S. Dep't of Com. ("EPIC")*, 928 F.3d 95, 101 (D.C. Cir. 2019).

**2. Plaintiffs lack organizational standing**

Plaintiff NAACP appears to contend that it has organizational standing because it has had "to divert resources from core election-support activities[.]" Pls. Mot. at 21. Organizations may

"sue on their own behalf for injuries they have sustained[,]" but, like all litigants, they must "satisfy the usual standards for injury in fact, causation, and redressability." *All. for Hippocratic Med.*, 602 U.S. at 393-94. Specifically, NAACP contends that it has "diverted resources towards developing know your rights materials, holding branch and conference meetings to address member fears, and responding to individual member inquiries around voting and rights at the polls in response to Defendants' planned mobilization." Pls. Mot. at 23; *see also* Sterling Decl. ¶¶ 11, 17, 20. None of these allegations establish organizational standing.

*First*, for the reasons explained previously, this fear, which provides the basis for the diversion of resources, is speculative.

*Second*, Plaintiffs' asserted expenditure/diversion of resources theory has been squarely rejected by the Supreme Court. In *Alliance for Hippocratic Medicine*, four associations challenged actions by the Food and Drug Administration (FDA) relaxing "regulatory requirements for mifepristone, an abortion drug." 602 U.S. at 372-73, 376. Although the associations neither prescribed nor used mifepristone themselves, they asserted that they had standing to challenge FDA's actions because those actions "impaired" the associations' "ability to provide services and achieve their organizational missions." *Id.* at 394 (citation omitted). Thus, the associations asserted that their injuries went beyond "mere disagreement with FDA's policies" because they had "incurr[ed] costs to oppose FDA's actions." *Id.* For example, the associations had "conduct[ed] their own studies on mifepristone so that" they could "better inform their members and the public about mifepristone's risks." *Id.* And they had "expend[ed] considerable time, energy, and resources drafting citizen petitions to FDA, as well as engaging in public advocacy and public education." *Id.* (citation omitted). Those activities, the associations asserted, had required them to

expend "considerable resources to the detriment of other spending priorities." *Id.* (citation omitted).

But the Supreme Court unanimously held that associations "cannot spend [their] way into standing[.]" *Id.* The generic setback to associations' missions without any actual "impediment to [their] advocacy businesses" does not support Article III standing. *Id.* at 395. To hold otherwise would allow virtually every organization to "manufacture its own standing" by "spend[ing] a single dollar" to counteract any governmental policy it wishes to challenge. *Id.* at 394–95. So too here.

Plaintiffs cannot show that Defendants' challenged actions actually interfere with Plaintiffs' ability to pursue activities like voter mobilization. "[A]n organization may not establish standing simply by spending money 'opposing those policies' that it 'dislike[s].'" *Ctr. for Taxpayer Rts. v. IRS*, No. 26-5006, __ F.4th __, 2026 WL 2635380, at *5 (D.C. Cir. Sept. 8, 2026) (quoting *All. for Hippocratic Med.*, 602 U.S. at 395). It is only when "a government action 'directly affect[s] and interfere[s] with' an organization's 'core business activities,' and the organization 'diverted its resources' *to continue pursuing those activities*, [that] such concrete harm to the organization's activities supports standing to sue." *Id.* (emphasis added); *see also, e.g., Indep. Mkt. Monitor for PJM v. FERC*, 162 F.4th 1167, 1173-74 (D.C. Cir. 2025) (finding that the plaintiff might have demonstrated organizational standing had it alleged the defendant's actions "deprived it of the information it depends on to carry out its monitoring functions" and also showed "how it used its resources to counteract the injury" (cleaned up)).

### A. Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits

In addition to lacking standing, Plaintiffs also fail to demonstrate a substantial likelihood of success on the merits. *See Food & Water Watch*, 808 F.3d at 913 ("In order to obtain a

preliminary injunction, a party *must show*, among other things, a substantial likelihood of success on the merits.") (citation omitted) (emphasis added).

The government is likely to prevail on the merits of plaintiffs' claim that Defendants have "intimidate[d], threaten[ed] or coerce[d]" them "for urging or aiding" others to vote. *See* 52 U.S.C. § 10307(b). First, there is no private cause of action to enforce Section 11(b). Second, the provision does not apply to the federal government. And third, even if that provision were privately enforceable, the record still would not support the finding of intimidation.

**1. There Is No Private Right of Action to Enforce Section 11(b)**

[P]rivate rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but *also* a private remedy." *Id* (emphasis added). "Statutory intent on th[e] latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable . . . as a policy matter, or how compatible with the statute." *Id.* (citations omitted).

Section 11(b) does not contain an express private right of action, and nothing in that provision, or the rest of the Voting Rights Act, suggests that Congress intended to create one by implication. Indeed, the opposite is true. The Act provides expressly for enforcement of Section 11(b) by the Attorney General, 52 U.S.C. § 10308(d) (authorizing Attorney General to seek injunctions against "any act or practice prohibited by section . . . 10307"), and "the express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others," *Sandoval*, 532 U.S. at 290.

Moreover, where Congress elsewhere enacted language recognizing that *some* provisions of the Voting Rights Act are privately enforceable by "an aggrieved person," it expressly cabined that recognition to "proceeding[s] instituted . . . under" statutes enacted "*to enforce the voting*

*guarantees of the fourteenth or fifteenth amendment*." 52 U.S.C. § 10302 (emphasis added); *see also Morse v. Republican Party of Virginia*, 517 U.S. 186, 233-34 (1996) (holding that because a different section of the Act was "by its terms . . . designed for enforcement of the . . . Fourteenth and Fifteenth Amendments," Congress "must have intended it to provide private remedies"). But Section 11(b)—which applies to private conduct as well as state action, and requires no showing of discriminatory or race-based intent—is manifestly not based on those provisions. *Gardner v. Jessup*, 2025 WL 4743403, at *6 (S.D. Ga. June 26, 2025), *vacated on other grounds* 2026 WL 3089236 (S.D. Ga. June 29, 2026); *Andrews v. D'Souza*, 696 F. Supp. 3d 1332, 1351 (N.D. Ga. 2023). Rather, it is based on Congress' authority to "make or alter . . . Regulations" governing federal elections. U.S. Const. art. I, § 4, cl 1; H.R. Rep. 89-439 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462.

**2. "Persons" Under Section 11(b) Does Not Apply to the Federal Government**

Even if Section 11(b) were privately enforceable, plaintiffs still would have no likelihood of success. As an initial matter, Section 11(b), which bars a "person, whether acting under color of law or otherwise," 52 U.S.C. § 10307(b), from engaging in voter intimidation, does not apply to the federal government. "In the absence of an express statutory definition," the Court applies a "longstanding interpretive presumption that 'person' does not include the sovereign and thus excludes a federal agency," *Return Mail, Inc. v. USPS*, 587 U.S. 618, 626 (2019), and federal officials sued in their official capacity. The conclusion that Section 11(b) does not apply to the federal government is confirmed by the statute's express enforcement mechanism, which is a civil action brought by the Attorney General "for the United States, or in the name of the United States." *See* 52 U.S.C. § 10308(d). It is nonsensical that the Attorney General would sue the United States on behalf of the United States, and given this context and background interpretive principles, it is

clear that Congress did not intend for the "persons" governed by the statute to encompass the United States

**3. Plaintiffs Are Not Likely To Succeed on Their Section 11(b) Claim**

In any event, even if the United States is a "person" under Section 11(b), the plaintiffs' allegations do not make out any likely violation. By its plain terms, Section 11(b) does not reach every action that incidentally or inadvertently discourages someone from voting or attempting to vote. Rather, it prohibits only intimidating, threatening, or coercing a person "for" voting or attempting to vote. 52 U.S.C. § 10307(b). In other words, intimidation can violate Section 11(b) only if it is "'because of,' 'on account of,' or 'in consequence of'" the alleged victim's protected activities. *For*, Black's Law Dictionary (1968 ed.). The statute thus requires *some* causal link between the intimidation and the protected activity. *See Lapham v. Walgreen Co.*, 88 F.4th 879, 890–91 (11th Cir. 2023) (a statutory ban on employer retaliation against an employee "*for* opposing any practice made unlawful" imposed a but-for causation standard (citation and internal quotation marks omitted) (emphasis in original)).

There is no likelihood that plaintiffs can make the necessary showing of cause here, where the record shows at most that Defendants are sending election monitors to ensure compliance with existing federal law, including applicable federal civil rights statutes. *See* 28 C.F.R. §§ 0.50 and 0.51. All the record evidence proves is that the government, in accordance with past practice, will have volunteers to serve as poll monitors. Neff Decl. ¶¶ 2-14. DOJ is not engaging any sworn law enforcement personnel who are legally authorized to effectuate an arrest to act as monitors in a "law enforcement agent" capacity. *Id.* Further, there will be no Federal Bureau of Investigation or U.S. Immigration and Customs Enforcement employees, much less agents, serving as monitors. *Id.* Employees from the Federal Bureau of Prisons; the Bureau of Alcohol, Tobacco, Firearms and Explosives; and the Drug Enforcement Administration will serve as monitors. *Id.* As with all

monitors, those employees are prohibited from having any firearms with them, and they are prohibited from undertaking any action while monitoring other than normal CRT monitoring conduct such observing the polling place and taking notes on their observations. *Id.* Thus, while monitoring, the monitors will not be acting as "law enforcement personnel," a "law enforcement officer," or a "law enforcement agent" as commonly understood. *Id.*

Moreover, monitors have been instructed and trained to not intrude or interfere in any way with either anyone voting or the election officials at the polling place, dress in business casual clothing, follow all state and jurisdictional rules applicable to where the monitor is assigned, not to talk with any voters inside the polling place, and to only talk to voters outside the polling place after the voter has cast her ballot, and to introduce themselves to election officials, with their federal employment credentials, to verify they are federal employees if asked. *Id.*

In short, the training and instructions to monitors, including that a monitor should dress in plain clothes and not interact with any voters inside a polling place, will ensure that monitors do not interfere with voters or the voting process, and therefore will reduce any possibility that voters would perceive a monitor as a coercive or intimidating presence. This is not at all analogous to the cases Plaintiffs rely on where voter intimidation was found. *See generally* Pls.' Mot. at 15. Plaintiffs are not likely to succeed on their Section 11(b) claim.

### B. Plaintiffs Cannot Establish a Risk of Irreparable Harm

Plaintiffs' motion for preliminary relief must also be denied because they do not meet their burden to establish substantial likelihood of irreparable harm. "[A] 'movant's failure to show any irreparable harm is . . . grounds for refusing to issue a preliminary injunction, even if the other three factors . . . merit such relief.'" *Clevinger v. Advoc. Holdings, Inc.*, 134 F.4th 1230, 1236 (D.C. Cir. 2025) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)); *see also*, *e.g.*, *D.A.M.*, 474 F. Supp. 3d at 56 (The D.C. Circuit "has made

clear…that an absence of irreparable injury is fatal to a plaintiff's motion" for preliminary relief. (citation omitted)); *Taylor v. Trump*, 788 F. Supp. 3d 1, 7-8 (D.D.C. 2025) ("It is clear that a failure to show a likelihood of irreparable harm is standing alone sufficient to defeat the motion" for emergency relief. (citation modified)).

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297. For one, "the injury 'must be both certain and great; it must be actual and not theoretical.'" *Id.* (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). "The moving party must show the injury complained of is of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm." *Id.* (citation omitted). And of course, "the injury must be beyond remediation." *Id.* That means that even "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* at 297-98 (citation omitted).

First, as discussed above, Plaintiffs have failed to demonstrate that they have Article III standing to bring this motion. *See DSCC v. Trump*, 834 F. Supp. 3d 19, 40-41 (D.D.C. 2026) ("Where plaintiff 'has failed to demonstrate an injury in fact sufficient to establish standing, he has also failed to demonstrate irreparable harm warranting a preliminary injunction.'" (quoting *Sibley v. Alexander*, 916 F. Supp. 2d 58, 63 (D.D.C. 2013))). Plaintiffs argue that they "fear that they or someone in their family, neighborhood, or community will be affected" by the alleged conduct, *see* TRO Motion at 20, but such speculative fears are not enough to satisfy Article III standing, *see, e.g.*, *DSCC*, 834 F. Supp. 3d at 31 ("[T]he Supreme Court has repeatedly said that 'allegations of *possible* future injury' are not sufficient to establish injury in fact." (quoting *Clapper*, 568 U.S. at 409)), much less do they satisfy the irreparable harm standard. *See Air Transp.*

*Ass'n of Am. v. Export-Import Bank of the U.S.*, 878 F. Supp. 2d 42, 60 (D.D.C. 2012) ("The irreparable-harm standard requires a more significant showing than the injury-in-fact standard.").

Second, even if standing were not at issue, Plaintiffs' allegations do not establish the necessary threat of irreparable harm. Plaintiffs argue that they "fear" being intimidated or facing reprisal from the government for lawfully casting ballots, but they point to no instance of when the federal government has unlawfully prevented any person from voting. *See generally* TRO Motion at 20-24. Grasping for something, Plaintiffs argue that one declarant's fear is valid because "*local* law enforcement pepper sprayed dozens of Black people on their way to the polls in 2020." *Id.* at 22. The federal government has not control over what local law enforcement did or did not do.

Indeed, aside from failing to meet their burden of demonstrating irreparable harm, denying a preliminary injunction will not injure Plaintiffs, their members, or the public at all. Plaintiffs again only insinuate vague allegations that voters will be confused or unduly influenced, while also discussing the public benefit of several activities not at issue in this lawsuit: "voter registration, voter education, voter outreach, and other voting-related activities." *See* TRO Motion at 25. Likewise, they argue that they fear "questioning, investigation, detention, or physical confrontation" without pointing to a single instance that anything like this has occurred, *see id.* at 25-26, and they express some concern that third-party election workers will be prosecuted. *Id.* at 23. But these are nothing more than a request by Plaintiffs for this Court to enjoin the federal government from ensuring the integrity of federal elections based on nothing more than alleged fears of unknown possible future prosecutions or intimidation in unknown locations. Another circuit court has recognized that courts cannot monitor the federal government's exercise of its discretionary investigative and prosecutorial powers. *See Olagues v. Russoniello*, 770 F.2d 791,

799 (9th Cir. 1985) ("as a general proposition, a district court has no 'power to monitor executive investigations before a case or controversy arises.'") (quoting *Jett v. Castaneda*, 578 F.2d 842, 845 (9th Cir. 1978))); *see also Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1416-17 (D.C. Cir. 1985) (noting that "agencies rightfully enjoy very broad discretion in determining what aspects of a problem warrant investigation").

Monitors receive two training sessions to emphasize the scope of their limited, but important, role at polling locations. They are instructed not intrude or interfere in any way with either anyone voting or the election officials at the polling place; follow all rules of the state and jurisdiction to which the monitor is assigned; and dress in business casual clothing and do not wear any insignia from their federal employment visible on their clothing. Monitors are instructed that their primary role is largely limited to observing, taking notes, and interviewing willing voters outside the polling place about their voting experience, where appropriate.

These facts rebut Plaintiffs speculative claims that Department monitors will have an intimidating effect on voters. Plaintiffs therefore have not established a "clear showing" of irreparable harm on this record. *Hanson v. District of Columbia*, 120 F.4th 223, 231 (D.C. Cir. 2024)

### C. The Balance of Equities Weighs Against Granting Plaintiffs' Request for Emergency Injunctive Relief

The Court need not reach the remaining preliminary injunction factors, but if it does, neither factor favors Plaintiffs' request for preliminary relief.

The balance of the equities and the public interest "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The government has a compelling interest in combating voter fraud. *See Anderson*, 417 U.S. at 227 ("Every voter in a federal primary election . . . has a right under the Constitution to have his vote fairly counted, without its being

distorted by fraudulently cast votes."); ; *see also Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."). "Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006). "Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government." *Id.* "Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised." *Id.*; *see South Carolina v. United States*, 898 F. Supp. 2d 30, 43 (D.D.C. 2012) (three-judge panel) (Kavanaugh, J.) (stating that "there 'is no question about the legitimacy or importance' of the interest in deterring voter fraud and that there is 'independent significance' in enhancing public confidence in the electoral system") (quoting *Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 196–97 (2008)).

Entering a TRO one day before an election based on speculative fears would also cause irreparable harm to the government and to the American public. Plaintiffs, in effect, are asking this Court to enjoin the federal government from enforcing federal laws for the midterm elections. By itself, that violation of the separation of powers constitutes an irreparable harm to the Executive Branch. *See Trump v. CASA, Inc.*, 606 U.S. 831, 859 (2025); *see Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 367 (2025) ("The Constitution charges the Executive Branch with enforcing federal law.").. "As the [Supreme] Court has indicated, any time that the Government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Noem v. Vasquez Perdomo*, 146 S. Ct. 1, 4 (2025) (Kavanaugh, J., concurring) (citation modified) (quoting *CASA*, 606 U.S. at 861). When "the Federal Government has an obligation," an order that "prevents" it "from using the program it believes is best suited to the task" of fulfilling that obligation inflicts irreparable harm. *Dep't of Homeland Sec. v. League of*

*Women Voters*, 609 U.S. ----, No. 26A308, 2026 WL 2879700, at *3 (U.S. Sep. 25, 2026) (per curiam). The Supreme Court emphasized that point recently in staying two lower court injunctions that interfered with the federal government's ability to enhance election integrity. *See Trump v. California*, No. 26A124, 2026 WL 2473573, at *4 (U.S. Aug. 24, 2026) (holding that the government was "likely to suffer irreparable harm" from an injunction that, *inter alia*, prohibited DHS "from trying to compile Citizenship Lists" and "deal[t] 'a serious setback' to the Executive's 'goals'"); *League of Women Voters*, 2026 WL 2879700, at *2-3 (holding that the government was "likely to suffer irreparable harm" from an order that "set aside and vacated" improvements to the DHS system that verifies citizenship and immigration status of noncitizens).

Because Plaintiffs' requested injunction would similarly prohibit Defendants from taking appropriate action to ensure voter integrity in advance of the upcoming November 2026 election, those harms are irreparable. *California*, 2026 WL 2473573, at *4; *see Nat'l Ass'n for the Advancement of Colored People v. U.S. Postal Serv.*, No. 26-5257, 2026 WL 2168004, at *1 (D.C. Cir. July 17, 2026) (finding the federal government demonstrated irreparable harm because "'there can be no do over' once the election occurs") (quoting *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016)).

Americans benefit from an electoral process that is safe, secure, and . Plaintiffs' requested injunction would undermine that important goal and frustrate the purpose of 18 U.S.C. § 611 to prevent noncitizen voting. The public interest and equities strongly tip in Defendants' favor and outweigh Plaintiffs' speculative and presently non-existent injuries.

### D. The Proposed Injunction Is Vague, Unworkable, and Violates the Separation of Powers

It is quite unclear what Plaintiffs really want and what their alleged fears are. Without evidence of any alleged misconduct occurring, the scattershot motion for a temporary restraining

order alleges speculative fears of voters or "someone their family, neighborhood, or community" will "encounter[] [] DOJ monitors" and somehow being intimidated from voting, TRO Motion at 20-22; of voters "facing intimidation and the possibility of imminent law enforcement investigation" in part because of past experiences with local (not federal) law enforcement, *id.* at 21-22; and of election workers being criminally prosecuted. *Id.* at 23.

Rule 65(d)(1) requires that "[e]very order granting an injunction" must "state its terms specifically[,]" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1). As the Supreme Court has explained, "the specificity provisions of Rule 65(d) are no mere technical requirements." *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974). Instead, "[t]he Rule was designed to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood." *Id.* After all, "[s]ince an injunctive order prohibits conduct under threat of judicial punishment, basic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Id.; see, e.g.*, *Common Cause v. Nuclear Regul. Comm'n*, 674 F.2d 921, 926-27 (D.C. Cir. 1982).

Even if Plaintiffs' alleged fears could satisfy Article III standing or the irreparable harm standard, the proposed relief by Plaintiffs is entirely unworkable. In assessing whether to grant injunctive relief, the Court must consider "what is workable," as foundational principles of equity demand. *North Carolina v. Covington*, 581 U.S. 486, 488 (2017) (citation omitted). Plaintiffs propose an order that (1) prohibits Defendants from having "any agents, officers, or personnel from any of Defendants' federal law enforcement agencies" nationwide, including "all agents, investigators, analysts, officers or any other employee or contractor from the following Department of Justice law enforcement agencies," ECF No. 14 at 2 ¶ 1-2; (2) prohibits the same

for five counties only, *id.*; (3) prevents those persons from "access[ing]" polling sites or "any area . . . around voting locations, drop boxes, election offices, or ballot counting/holding facilities from the effective date of this order though the end of the election period," *id.* at 3 ¶ 3; and (4) prohibits those persons from doing various law enforcement activities, including "us[ing] or threaten[ing] to use force, unless such force is objectively necessary and proportional to stop an immediate threat of physical harm," "[q]uestion[ing] individuals who are voting, attempting to vote, urging or aiding any person to vote or attempting to vote, or engaging in any other activity to effectuate an individual's right to vote" and "film[ing], photograph[ing], or record[ing] biometric data." *Id.* at 3 ¶ 4. The order also asks the Court to requires Defendants to issue guidance to DOJ components and state and local officials. *Id* at 4.

That broad proposed injunction violates the specificity requirements of Rule 65(d) by leaving Defendants guessing about what specific conduct would be enjoined and is unworkable, especially because it is fewer than 24 hours before an election. The order is vague because it is far from clear what various terms mean, including, among others, when "such force is objectively necessary and proportional to stop an immediate threat of physical harm, *id.* at 3 ¶ 4.iii, what it means to "[a]ccess" areas, *id.* at 3 ¶ 3.b, and how Defendants are to determine whether someone is "attempting to vote" or "urging or aiding" others to vote before deciding whether they can question or document those persons. *Id.* at 3 ¶ 4.iv-v. The proposed order would prevent federal law enforcement from showing up to a poll for any reason, even if there is an undisputed violation of federal law, such as a threat to election workers or to voters.

It is also unclear what relief could be ordered to satisfy Plaintiffs while allowing the federal government to enforce federal law, making it so any proposed injunction would infringe on core separation of powers principles. Plaintiffs' proposed nationwide injunction would indefinitely

preclude the federal government from enforcing federal law and would violate the separation of powers. As the Supreme Court emphasized, "federal courts do not exercise general oversight of the Executive Branch" and may not "prevent[ ] the Government from enforcing its policies against nonparties." *CASA*, 606 U.S. at 859, 861. Plaintiffs' injunction would prohibit the government from taking future actions to enforce the law.

## CONCLUSION

For the reasons explained above, the Court should deny Plaintiffs' motion for temporary restraining order and preliminary injunction.

Dated: November 2, 2026

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JOSEPH E. BORSON
Assistant Branch Director

*<u>/s/ Kathryn Barragan</u>*
Kathryn Barragan (DC Bar No. 90026294)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, D.C. 20005
Tel: (202) 598-7696
Email: Kathryn.e.barragan@usdoj.gov

Abigail Nusbaum (FL Bar No. 1059558)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 451-7304
Email: Abigail.S.Nusbaum@usdoj.gov

*Counsel for Defendants*